## THE NORFOLK AND WASHINGTON STEAMBOAT COMPANY

*v.*

## DAVIS.

---

LIBEL; PRIVILEGED COMMUNICATIONS; SPECIAL DAMAGES; TRIAL; INSTRUCTIONS TO JURY.

1. A letter from the general superintendent of a steamboat company charging a steamboat captain formerly in the employ of the company with gross incapacity and inefficiency in his calling, is libelous.

2. The question of whether such a letter was written within the scope of the writer's authority as superintendent and so bound the company, is properly left to the jury, when it appears that

the writer as superintendent had full control of the operation of the line of steamers run by the company and full authority to employ and discharge employees; that the letter was written in reply to one from a friend of the discharged employee protesting against his dismissal and urging his reinstatement, and that the company refused to interfere in the matter when the alleged libellous character of the letter complained of was brought to its attention.

3. In an action for libel, where the communication alleged to be libellous is claimed by the defendant to have been privileged, while all disputed facts are to be left to the jury, the question of privilege is one for the court.

4. A communication is privileged, within the rule, only when made in good faith, in answer to one having an interest in the information sought, or, if volunteered, when the party to whom the communication is made has an interest in it, and the writer stands in such relation to him as to make it a reasonable social duty, or at least when it is proper that he should give the information, as a just and reasonable means of guarding the person receiving the information against an act or dealing that might be prejudicial to him.

5. The mere fact that the person to whom a letter alleged to be libelous is sent had taken a special interest in the party concerning whom it is written, and had recommended him for employment, is insufficient to create a duty on the part of the writer, so as to bring the latter within the rule of privileged communications.

6. Where a libel is actionable *per se*, as where the words employed impute to the master of a vessel want of skill, the action is maintainable without either allegation or proof of special damages; and no proof of special damage is necessary to enable the plaintiff to recover, although special damage be alleged.

7. Where a libel is actionable without the averment of special damages, the jury may take into consideration not only the injury that has arisen, but that which may thereafter arise from the publication of the libel.

8. In an action for libel, an instruction is proper, that if the jury shall find for the plaintiff, they should award him such damages as will fairly and fully compensate him for the injury suffered, including injury, if any, done thereby to him in his occupation or calling, and the mental suffering resulting from the libel and the tendency thereof to bring him into disgrace and disrepute, especially when accompanied by instructions denying his right to recover for special and exemplary damages.

No. 739. Submitted December 14, 1897. Decided March 8, 1898.

HEARING on an appeal by the defendant from a judgment on verdict in a suit for libel. *Affirmed.*

## STATEMENT OF THE CASE.

This is an action for libel brought by Samuel B. Davis against the Norfolk and Washington, D. C., Steamboat Company. The alleged libel is contained in a letter written by John Callahan, the general superintendent of the defendant company, in reply to a letter from K. C. Murray. The letter of Murray, to which that of Callahan was a reply, was as follows:

Editoral rooms, Norfolk Landmark.

NORFOLK, VA., *August 21st*, 1893.

The Hon. John Callahan.

MY DEAR SIR: I very much regret to hear that you have suspended 'Captain Davis' or discharged him from your service, and am much at a loss to know why, for I considered him to be one of the best men in the steamboat service out of Norfolk. It has been intimated to me that the cause of your action is found in the fact that he is an applicant for the position of captain of the Virginia oyster fleet. I hope this is not true, for it would make a great impression on his friends, and he has many here and elsewhere, who do not see that the fact that he wishes to do what he thinks might better his condition should influence you to turn him off. Numbers of your friends are indorsing him for the captaincy of the oyster fleet, and they will feel very much hurt and disappointed to think that he has lost his position with you for that reason. I had thought that you would probably be more likely to indorse him for the place and would be glad to know that he had a prospect of bettering his condition. I hope that you will reconsider your action and retain Captain Davis in your service, and I hope so for the good of your line and the good of your business as well as for his own benefit.

Yours truly,　　　　　　　　　　　K. C. MURRAY.

In reply, Mr. Callahan wrote the following letter:

Norfolk and Washington, D. C., Steamboat Co., foot of Seventh street.

New iron palace steamers, N. & W., Washington & Norfolk, daily between Washington, D. C., Fortress Monroe, Va., & Norfolk, Va.

Wm. E. Clark, pres't; Levi Woodbury, vice-pres't; Jno. Callahan, gen'l sup't; R. F. Baker, treas.

WASHINGTON, D. C., *August 23rd*, 1893.

Mr. K. C. Murray, Norfolk Landmark, Norfolk, Va.

My DEAR SIR : I beg to acknowledge the receipt of your letter of the 21st inst. relative to the matter of Capt. S. B. Davis.

I think your knowledge of me is sufficient to know that I would not knowingly do any man an injustice. Your letter is the first intimation I had that Capt. Davis was an applicant for the position of captain of the " Virginia oyster fleet." His displacement by this company was based entirely upon his inefficiency. During the two years that he has been in our employ he has cost the company over $4,000.00 in damages. He was continually doing some damage to his vessel or to somebody else's vessel and to the wharves at which he had occasion to land.

It was determined by our directors one year ago to employ the first competent man that could be found to take this place. This was done a few days ago and Capt. W. C. Geoghegan appointed to command the steamer.

It is not my desire nor intention to in any manner injure Capt. Davis or prevent him from getting other employment, but in order to show you exactly how he handled his vessel at times during the two years we had him I will state that two weeks after he took command of the " Washington" he put her ashore on Hampton bar in such a perilous position that were it not for the presence of a Government steamer at "Old Point" at the time, who pulled her off, in

my opinion she would have been destroyed. A few months after the occurrence he damaged the wharf at "Old Point" so badly that it cost us $1,700 to repair it, in addition to cutting a hole in the steamer. The other accidents he has had which the company had to pay for are too numerous to mention here. In the matter of discipline and organization on his vessel, he was almost continually in trouble with his officers, and it was carried to such an extent as to make the vessel unsafe. As an instance of this I will simply cite one case from among a number. When I organized the line I brought here only two men from our section, one of whom is John H. Trower, chief engineer, and the other R. E. Pilkinton, purser of the steamer Washington. The latter I expect you know; he is a Richmond boy and the soul of honor and honesty. Capt. Davis imagined that this young man carried tales to me, and endeavored by the foulest of means to blacken the young man's reputation among the officers of his steamer, believing that such a course would compel Pilkinton to resign.

I have written you at greater length than I anticipated, but it was necessary in order to show you and other friends a few of the reasons only which necessitated the removal of Capt. Davis. There is nothing personal connected with it, and in proof of this I have only to say that the man who succeeded him is an entire stranger to me, and is employed purely on his reputation as a steamboat captain.

Yours very truly,

JOHN CALLAHAN,<br>*Gen'l Supt.*

At the trial of the case in the court below, the plaintiff requested three instructions to the jury, all of which were granted, as follows:

"1. If the jury find from the evidence that the defendant at the time of the writing of the letter set out in the declaration was a body corporate having, among other officers, a

president and board of directors and a general superintendent; that the certain John Callahan mentioned in the declaration was at the time of the writing of the said letter such general superintendent, and that his duties as such were to have general supervision and management of the affairs of the defendant; that as such general superintendent the said Callahan at the time had authority to dismiss employees of the defendant, subject to the approval of the president; that the plaintiff at the time was captain, in the employ of the defendant, and the said Callahan discharged him with the approval of the president of the company; that the said Callahan, as such general superintendent and in the ordinary course of his duties as such, wrote and mailed the said letter, as alleged in the declaration; that after his discharge the plaintiff brought to the notice of the president the fact that such a letter had been written and complained thereof, and the said president declined to take any action in relation to the said letter, the jury is instructed that the plaintiff is entitled to recover.   In considering whether the said letter was written and sent by the said Callahan in the ordinary course of his duties as such general superintendent, the jury may consider the facts, if it finds them to be facts, that the said letter was signed by said Callahan as general superintendent; that it was copied into the usual letter-book used by the said Callahan at his office as such general superintendent; that his said office and the said book were at all times open to the visitation and inspection of the defendant's other officers, including its president and directors, and that the said office of the said Callahan was regularly and frequently visited by the said president and directors in the exercise of their duties in respect to the supervision and management of the affairs of the defendant, and all the other facts which the jury finds to be established by the testimony in the case.

" 2. If the jury shall find for the plaintiff, in estimating the damages they should render their verdict for such sum as

the jury believes from the evidence will fully and fairly compensate the plaintiff for the injuries suffered by him by reason of the writing and sending of the said letter to said Murray, including injuries, if any, done thereby to the plaintiff in his occupation and calling as ship captain and pilot and his mental suffering arising out of the statements and accusations contained in the said letter, and the tendency thereof to bring the plaintiff into disgrace and disrepute among the men of his calling and his friends and acquaintances and the community in general in which he resides.

"3. The jury is instructed that publication, in the meaning of the law of libel, is the communication of a libel to some third person or persons, and accordingly that the communication of the libel complained of to Mr. Murray was a publication thereof, and the jury is further instructed that such communication to the said Murray will entitle the plaintiff to damages, provided that the jury, under other instructions of the court, shall find for the plaintiff."

The following instructions were requested on behalf of the defendant, the second, fifth and eighth of which were granted, and the others refused; to the refusal of which, as well as to the granting of the three instructions prayed by the plaintiff, the defendant duly excepted:

"1. The jury are instructed that upon the whole evidence, that offered on behalf of the plaintiff as well as that offered on behalf of the defendant, the plaintiff is not entitled to recover in this action and that they should render a verdict for the defendant.

"2. The jury are instructed that there is no evidence before the jury proving or tending to prove that the board on the Chesapeake and its tributaries declined or refused to employ the plaintiff as a captain or pilot by reason or on account of the letter set forth in the declaration or by the publication thereof, and the plaintiff is not entitled to recover in this action any damages against the defendant on account or by

reason of the nonemplyment by the said board of the plaintiff as captain and pilot.

"3. The jury are instructed that no evidence has been offered on behalf of the plaintiff proving or tending to prove that any person or corporation declined to employ the plaintiff as captain or pilot by reason of the letter set forth in the declaration or the publication thereof, and that the plaintiff is not entitled to recover in this action any damages against this defendant by reason of the nonemployment or the inability of the plaintiff to obtain employment as captain or pilot.

"4. The jury are instructed that no evidence has been adduced on behalf of the plaintiff from which the jury can find that any special damage or injury has resulted to the plaintiff by reason of the writing and publication of the letter set forth in the declaration.

"5. If the jury shall find from the whole evidence that the letter set forth in the declaration was witten by John Callahan in reply to the letter in evidence signed by K. C. Murray and addressed to the Hon. John Callahan, and that the writing and publication thereof were the personal and independent acts of said Callahan in reference to the communication addressed to him personally (if the jury shall find that such communication was addressed to the said Callahan personally), and that the reply thereto set forth in the declaration was not written or published by the said Callahan in the course of his duties or service as general superintendent of the defendant company, and was not after such publication approved or ratified by the defendant (if the jury shall so find), then the said Callahan is alone responsible for all the consequences of the writing and publication of said letter and the plaintiff is not entitled to recover in this action.

"6. If the jury shall find from the whole evidence that the letter set forth in the declaration was written by John Callahan, signing his name thereto as general superintendent, in

reply to the letter in evidence signed by K. C. Murray, and if the jury shall further find from the evidence that in writing said last-mentioned letter the said Murray was acting at the request or by the contrivance of the plaintiff, then the plaintiff is not entitled to recover in this action.

"7. The jury are instructed that in order to find that the defendant published the letter described in the declaration with express malice against the plaintiff, the jury must be satisfied by fair preponderance of evidence that said publication was made with a deliberate motive on the part of the defendant to injure the plaintiff in his business as captain and pilot.

"8. The jury are instructed that in this case it is a question for the jury to determine whether the corporation defendant authorized the publication of the letter set forth in the declaration, and whether it ratified the publication of said letter after the same had been made, and whether said publication was made by its servant or agent in the course of his employment, and whether the writing and publication of said letter was within the scope of the duties of such servant or agent; and if the jury shall find that from the whole evidence that the defendant corporation did not authorize the writing and publication of said letter, and did not ratify the same or the publication thereof after the same had been published, and that the writing and publication of said letter was not made by said Callahan within the scope of his duties or authority as general superintendent of the defendant company, then the plaintiff is not entitled to recover in this action.

"9. The jury are instructed that if they shall be unable to determine from the whole evidence whether the injuries to the plaintiff in his occupation as captain and pilot complained of in the declaration were occasioned to the plaintiff by the publication by the defendant of the letter set out in the declaration (if the jury shall find that there was publication of said letter by the defendant, and that the injuries com-

plained of did occur), or whether said injuries were occasioned by the publication and use made of said letter by said K. C. Murray, to whom said letter was addressed, or by the plaintiff himself, if the jury finds there was publication of said letter by the said Murray and the defendant, the jury cannot by their verdict assess any damage against the defendant for or in respect of the said injuries to the plaintiff in his occupation as captain and pilot.

"10. The jury are instructed that, in order to entitle the plaintiff to recover in this action damages against the defendant for and in respect of injuries to the plaintiff in his occupation and calling as a ship captain and pilot, the burden of proof is upon the plaintiff to prove to the satisfaction of the jury, by a fair preponderance of the evidence, that the injuries to the plaintiff in his said occupation and calling as a ship captain and pilot were caused by the writing of the letter set forth in the declaration and the publication thereof by the defendant; and if the jury shall further find said letter was sent by the defendant to K. C. Murray, at Norfolk, Virginia, and was by said Murray sent to the plaintiff a few days after it was written and was retained by the plaintiff until on or about October, 1893, and that the plaintiff then returned the original of said letter to said Murray, but retained a copy thereof, and that the plaintiff, after receiving said letter from the said Murray, showed the same or a copy thereof to several persons, and if from the whole evidence the jury is unable to determine whether the injuries to the plaintiff in respect of his said business and occupation complained of in the declaration, if the jury shall find such injuries were occasioned to the plaintiff, were caused by the publication of said letter by the defendant or by the publication and use thereof made by the plaintiff or by the said Murray, then the jury can not by their verdict find or assess against the defendant any damage for or in respect of injuries to him in respect of his said occupation and business.

"11. If the jury shall find from the whole evidence that

the letter set forth in the declaration was written and signed by John Callahan as general superintendent of the defendant, in reply to the letter in evidence signed by K. C. Murray, dated August 21, 1893, and that at the time the said last-mentioned letter was written the said plaintiff was an applicant for employment as captain of the Virginia oyster fleet to the board of the Chesapeake and its tributaries of the State of Virginia, and that the said K. C. Murray was at that time aiding the plaintiff in his efforts to obtain said employment, and that on the day said last-mentioned letter was written by the said Murray and before the same was written the plaintiff had informed the said Murray by telegraph that he, the plaintiff, had been discharged by the defendant without reason therefor having been given for such discharge, and that said letter was published by the defendant, the jury are instructed that the letter so signed and published was a qualified privileged communication, and the plaintiff cannot recover in this action damages against the defendant in respect of the injuries described in the declaration unless the jury is satisfied from· the whole evidence that the said letter set forth in the declaration was published by the defendant with actual malice towards the plaintiff.

"12. The jury are instructed that they can not render a verdict against the defendant in this action, unless they are satisfied from the whole evidence that the letter set forth in the declaration was published by the defendant with actual malice towards the plaintiff.

"13. The jury are instructed that in order to entitle the plaintiff to recover in this action damages against the defendant for and in respect of injuries to the plaintiff in his occupation and calling as a captain and pilot, the burden of proof is upon the plaintiff to show to the satisfaction of the jury, by a fair preponderance of evidence, that the injuries to the plaintiff in his said occupation and calling as a captain and pilot were caused by the writing of the letter set forth in the

declaration and the publication thereof by the defendant and not by any publication thereof made by the plaintiff himself, and if the jury shall be unable to determine from the whole evidence whether said injuries, if the jury shall find them, were caused by the publication of said letter by the defendant or whether the same were caused by the publication of said letter by the plaintiff, then the jury can not assess or find any damages against the defendant by reason of such said injuries to the plaintiff in his said occupation."

The further material facts will be found stated in the opinion of the court.

*Mr. A. T. Britton, Mr. Nathaniel Wilson* and *Mr. A. B. Browne* for the appellant:

1. The defendant company was not required to adopt or refuse to adopt the Callahan letter, and by such adoption admit its liability, or by such omission give the plaintiff the right to claim ratification. *Edellman* v. *Transfer Co.*, 3 Mo. 503.

2. The Murray letter invited the full reply made by Callahan, giving in detail the reasons why Davis was regarded as inefficient to retain command of the " Washington," or to longer remain in the company's service. If these statements had been made orally to Murray by Callahan, in response to the latter's oral averments corresponding with the expressions used in his letter to Callahan, such reply would have been privileged, and Davis would have had no action against Callahan founded thereon, unless coupled with full proof of express malice. The case is not changed because the same friend of Davis makes the same application in writing, and receives in return the same reply. Newell, Def., S. & L., Sec. 114.

Upon the facts disclosed, it was both the province and the duty of the court to rule that the letter in suit was a qualified privileged communication, on which no recovery could be had by way of damages, without express proof of malice.

or, if the facts in regard to the relations of Davis and Murray were in any possible doubt, this question of fact should have been submitted to the jury, with proper instructions, as prayed, and dependent upon which its finding the liability or non-liability of the defendant company would have been established. Odyers, L. & S.

If the plaintiff had, himself, made application to the defendant for the reason for his discharge, and for reconsideration of its action, and for reinstatement, the defendant's reply would have been privileged. If such application were made in person, orally, what was said would have been privileged, even if made in the presence of other persons. *Beeler* v. *Jackson*, 64 Md. 589; *Fresh* v. *Cutler*, 73 Md. 90; *Billings* v. *Fairbanks*, 136 Mass. 177; 139 Mass. 66. If the application was made by Murray, acting at the in-instance and instigation of Davis, and by his authority, the reply, for the same reasons, would be privileged. Newell, 490, 497.

The letter of Murray charged Callahan with a single and unworthy motive in discharging Davis, and by innuendo as so done to prevent him from obtaining other employment. This called for self-defence, and communications in fair self-defence are privileged. Newell, 519.

3. Independent of the relation of master and servant, the knowledge of Callahan that Murray and others were endorsing Davis for a public position gave him in turn the right to even volunteer information which he believed was in the performance of his duty and as imposing a social and moral obligation. *Rude* v. *Nass*, 79 Wis. 324; *Bradley* v. *Heath*, 12 Pick 164; *Railway Co.* v. *Richmond*, 73 Tex. 568; *Erber* v. *Dun*, 12 Fed. R. 526; *Locke* v. *Bradstreet*, 22 Fed. R. 771.

4. Even upon the theory of the company being responsible for the Callahan letter, the letter is declared on as one publication, having been written by a former employer to his employee, or to his employee's agent or representative, who was urging his reinstatement as well as his appointment to

a public office, and, being thus privileged, the privilege could not be destroyed, because the letter answered more than was asked. Townsend on L. & S. 824, Sec. 244. The privilege is not defeated by the mere fact that the communication is made in terms that were intemperate or excessive from over-excitement. *Atwell* v. *McIntosh*, 120 Mass. 177; Newell on D., L. & S. 510. The character of the defendant's letter as a conditionally privileged communication was not destroyed by the reference therein to "other friends."

*Mr. Henry E. Davis* and *Mr. D. W. Baker* for the appellee:

1. That a corporation can be sued for a libel committed by its officers there is no doubt; and it is liable whether the libel was published within the scope of authority or afterwards ratified by the corporation. *Gas Light Co.* v. *Lansden*, 9 App. D. C. 508; *Railroad Co.* v. *Richmond*, 73 Tex. 568; *Machine Co.* v. *Souder*, 58 Ga. 64; *Fogg* v. *Railroad Corp.*, 148 Mass. 513; *Railroad Co.* v. *Quigley*, 21 How. 202; *Dawson* v. *Holt*, 11 Lea, 583.

2. The letter being libelous *per se*, the jury were to assess the general damages sustained by the plaintiff, and in doing so they had a right to find in a sum which would fairly compensate the plaintiff for the injury he had sustained, and they could take into consideration all of the surrounding circumstances of the parties, the injury to plaintiff individually, whether mental or otherwise, and the injury to the plaintiff in his calling or trade. Newell, Libel and Slander, 841; *Hastings* v. *Stetson*, 130 Mass. 76; *Marble* v. *Chapin*, 132 Mass. 2.

3. The occasion of sending the letter in question was not privileged. At the time of sending the letter, Callahan, who wrote it, knew of no relation between Murray and the plaintiff making it possible for the writer to think that Murray had any interest in receiving the letter, and the letter was not called forth by any conduct of either Murray or the plaintiff. Murray was not an intending employer,

nor was he professing to act in behalf of an intending employer, or any other person contemplating the employment. of the plaintiff. For the rule on the subject of privileged communications by former employers see 12 Am. & Eng. Encyc. L. 412. The very essence of privilege is knowledge by the writer that he is sending a communication which the law makes it his duty, legal or moral, to send, and where the writer is unaware of the relation of the person addressed to the person libeled, there can not possibly arise the question of privilege.

4. The letter in question was not privileged. *Hebditch* v. *McIlwaine*, 2 L. R. Q. B. Div. 54; *Bailey* v. *Holland*, 7 App. D. C. 184; *York* v. *Johnson*, 116 Mass. 483; *Krebs* v. *Oliver*, 12 Gray, 239.

5. Attention is asked to that feature of the libel which authorizes or prompts its exhibition to others than Murray. The portion of the libel referred to is that in which the writer states that he has set forth at greater length than he anticipated what is therein contained for the declared purpose that Murray "and other friends" might know his reasons for dismissing the plaintiff. Apart from the fact that the statements referred to clearly exceeded the exigency of the occasion, even assuming it privileged (*Robinett* v. *Ruby*, 13 Md. 95), the feature of the communication referred to clearly deprives it of all right of claim to privilege. *Coles* v. *Thompson*, 27 S. W. 46.

Privilege in the law of libel sounds in duty, and there can be no claim of privilege by a writer who, in his writing, expresses either his intention or his desire that the contents of his writing may be known to others to whom confessedly he has no duty.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

This action is brought for an alleged libel published by the authority of the defendant, the present appellant, against

the appellee, the plaintiff in the court below. The libel complained of is contained in a letter written by John Callahan to K. C. Murray, dated August 23, 1893. It was in reply to a letter of Murray, written from Norfolk, Va., and dated August 21, 1893, that the letter of Callahan was written. These two letters will be found set out in full by the reporter, in the prefatory statement of this case.

It appears that the defendant is a corporation and was, in 1893, operating a line of steamers between Washington City, D. C., Fortress Monroe, and Norfolk, Va., and at the time the letter containing the alleged libel was written Callahan was the general superintendent and manager of the defendant's line of steamers, with full authority to employ and discharge all employees of the company, from the commanders of the steamers to the lowest subordinate in the service. The plaintiff Davis had been for several years prior to that time captain of the steamer "Washington," one of the steamers of the line, and remained in such employment until August 21, 1893, when he was notified by Callahan that his employment by the company would terminate at the end of that month.

It also appears that Murray was the friend of Davis, and upon being informed by the latter that he had been discharged or relieved from the command of the steamer "Washington," Murray thereupon immediately wrote the letter to Callahan of August 21, 1893, and which letter brought forth the letter from Callahan of the 23d of August, 1893. This letter from Callahan, as will be observed, professes on its face to speak for the company, and is signed by him as the general superintendent of the company. And whether it was written under such circumstances as to bind the company for the consequences of its publication is one of the principal questions in the case.

The letter to Murray is alleged to be libelous, and it doubtless is so, for it contains grave charges against the plaintiff as to his want of efficiency and capacity as com-

12 Ct. App.—22

mander in the management of the steamer from which he had been discharged. Murray is not shown to have been in any manner interested in the affairs of the defendant company, nor in any employment that the plaintiff was seeking to obtain at the time; his only interest being of a mere personal friend, desiring to áid, as far as he could, the . success of one whom he regarded as worthy and meritorious.

In the declaration it is alleged that the plaintiff had been engaged in the business and profession of a captain and pilot on various steamers carrying freight and passengers on the Chesapsake Bay and the Potomac River, and other tributaries of said bay, and had held a license as a pilot on said bay and river for many years; that before the committing by the defendant of the grievances hereafter mentioned, he had been in the employ of the defendant for a long time, to wit, two years and a half, in the capacity of captain on one or more of the defendant's steamboats, and had faithfully performed his duty in such employment; and that the plaintiff, before the committing by the defendant of the grievances hereafter mentioned, had quitted and left the service of the defendant, and was likely to be retained and employed by the board of the Chesapeake and its tributaries of the State of Virginia as captain of the Virginia oyster fleet; yet the defendant, well knowing the premises, but contriving and wickedly and maliciously intending to injure the plaintiff in his character and reputation, as a captain and pilot as aforesaid, and to bring him into public scandal and disgrace, etc., published the letter heretofore referred to, written to said Murray. And in the second count of the declaration, it is alleged that by means of the committing of said grievances the plaintiff has been greatly injured in his good name and character, and brought into public scandal and disgrace with and among all to whom he is in anywise known, and been caused to be believed and suspected to be inefficient and wholly unfit to be employed in the line of his business and profession as a captain and

pilot as aforesaid; and by reason whereof the plaintiff has not only lost and been deprived of the support and emoluments which might and otherwise would have accrued to him by reason of his being so employed but also has remained and continued, and is still out of employment, and deprived of the opportunity of supporting himself by means of his business and profession, and has been and is by and on account of the said premises otherwise greatly injured and damnified, to the sum, etc.

To each count of the declaration the defendant pleaded not guilty.

At the trial the letters heretofore referred to were given in evidence by the plaintiff, and there was evidence on both sides introduced reflecting upon the question, whether the letter of Callahan to Murray was written within the scope of the authority delegated to him by the defendant company, or whether that letter had been subsequently approved by the company or the president thereof. There is no dispute or question as to the fact that the letter was written and sent by Callahan to Murray. That fact is conceded. But, assuming that the letter had been written by Callahan, within the scope of his authority as superintendent, or that the writing of the letter had been approved by the defendant, and the latter was therefore liable, unless exonerated by privilege, the principal ground of defence relied on by the defendant is, that the occasion of the writing and publishing of the letter was privileged, and that the only question left for determination was, whether the facts and circumstances given in evidence on the part of the plaintiff, were sufficient to show malice in fact on the part of the defendant, and thus overcome and defeat the supposed privilege of the communication.

Upon the close of the evidence, each party offered a series of prayers for instruction to the jury. The three prayers offered by the plaintiff were all granted, while of the thirteen prayers offered by the defendant, only the second, fifth and

eighth were granted, and all the rest were refused. The court gave a separate instruction in lieu or place of the thirteenth prayer offered by the defendant. All the prayers offered, both by plaintiff and defendant, will be found set out in full by the reporter, in the statement of the case. The verdict and judgment being against the defendant, it has appealed, and, as grounds for reversal of the judgment, has assigned seven errors, most of which have reference to the rulings of the court denying the privilege claimed for the communication from Callahan to Murray.

Before proceeding to consider the specific errors assigned, it would seem to be proper to state a few of the general well-settled principles of law, applicable to the facts of the case. The onus of proof, of course, was upon the plaintiff to establish the fact of the publication of the letter containing the libel declared on, and that the letter was written and published under such circumstances as to render the defendant liable therefor. We do not understand it to be seriously argued that the letter is not libelous, and if the circumstances of its publication be such as to make it the act of the defendant, by its authorized agent, that the plaintiff would not be entitled to recover, unless, indeed, the occasion of the writing and publishing the letter afforded to the defendant or its agent a qualified privilege for the communication. But it is contended on the part of the defendant, 1st, that the letter to Murray was not the act, or the authorized act, of the defendant, but was the mere personal act of Callahan, the general agent and superintendent of the defendant; and, 2d, that if the letter was written under such circumstances as to make it the act of the defendant, there were facts and circumstances that afforded a qualified privilege that would exempt the defendant from liability.

In regard to the first of these contentions, that of the absence of authority in Callahan to bind the defendant by the letter to Murray, we must bear in mind the fact that Callahan appears to have been invested with general and

almost supreme authority in the management of the operative affairs of the line of steamers. He had full and complete authority in respect to the employment and discharge of all the employees engaged about the steamers; and it was in the exercise of this authority that he discharged the plaintiff from his position as the commander of the steamer "Washington." The letter of Murray to Callahan had reference to the authority of the latter as general superintendent, for by that letter Callahan was requested to reinstate the plaintiff in his former position. But instead of simply replying to the letter that he deemed it to be to the interest of his company to put some other person in the place of the plaintiff, Callahan thought proper to go into many circumstances and occurrences that he must have known would disparage and throw discredit upon the plaintiff as a commander of a steamer. This he was not asked to do by the letter from Murray. The letter from Callahan to Murray professes upon its face to have been written by virtue of his position of general superintendent of the defendant; and the subsequent refusal of those in authority to interfere when the matter was brought to their attention was a fact, not without weight, to be considered by the jury, in determining the question wheter the letter was written and published within the scope of the authority delegated to Callahan as general agent and manager, or by the subsequent approval of the defendant company. The question was very fully and fairly submitted to the jury, and they have found adversely to the contention of the defendant.

Seeing, then, according to the finding of the jury, that the defendant is liable for whatever is actionable in the letter written by its superintendent, Callahan, the next question is, do the circumstances of the case show that the letter complained of was written upon an occasion that entitled the defendant to the benefit and protection of a privileged communication? And while all disputed facts were required to be submitted to the jury, the question of priv-

ilege was one of law for the court to decide. It is argued that because Murray had taken a special interest in his friend, the plaintiff, and had recommended him for appointment to the position of captain of the Virginia oyster fleet, he therefore had a special interest in the matter of the discharge of the plaintiff from the service of the defendant company, and, consequently, there was a duty, at least of a moral nature, on the part of the superintendent of the defendant, to make the communication to Murray. But to this proposition we can not accede. We know of no well-recognized authority that carries the principle of privileged communication to such an extent. There was no duty either legal or moral that required the making of the communication to Murray, and there was no such interest in Murray as would have entitled him to request such communication even if he had been disposed to make it; but he made no request for the communication of the matter complained of by the plaintiff. The reason assigned by Callahan for the extended communication is stated in the letter to Murray. He says: "I have written you at greater length than I anticipated, but it was necessary in order to show you *and other friends* a few of the reasons only which necessitated the removal of Capt. Davis."

There has been considerable diversity of opinion as to what constitutes a privileged occasion and how far the occasion will justify communication; and some of the cases have carried the privilege to a great extent. But, as said by the Supreme Court, in the case of *White* v. *Nicholls*, 3 How. 287: "It is difficult to conceive how, in society where rights and duties are relative and mutual, there can be tolerated those who are privileged to do injury *legibus soluti*; and still more difficult to imagine, how such a privilege could be instituted or tolerated upon the principles of social good. The privilege spoken of in the books should, in our opinion, be taken with strong and well-defined qualifications. It properly signifies this, and nothing more:  That the excepted instances shall

so far change the ordinary rule with respect to slanderous or libelous matter, as to remove the regular and usual presumption of malice, and to make it incumbent on the party complaining to show malice, either by the construction of the spoken or written matter, or by facts and circumstances connected with that matter, or with the situation of the parties, adequate to authorize the conclusion. Thus, in the case of *Cockayne* v. *Hodgkisson*, 5 C. & P. 543, we find it declared by Parke, Baron, 'That every wilful and unauthorized publication injurious to the character of another is a libel; but where the writer is acting on any duty, legal or moral, towards the person to whom he writes, or is bound by his situation to protect the interests of such person, that which he writes under such circumstances is a privileged communication, unless the writer be actuated by malice.' So, in *Wright* v. *Woodgate*, 2 Cr. M. & R. 573, it is said, 'a privileged communication means nothing more than that the occasion of making it rebuts the *prima facie* inference of malice arising from the publication of matter prejudicial to the character of the plaintiff, and throws upon him the *onus* of proving malice in fact; but not of proving it by extrinsic evidence only; he has still a right to require that the alleged libel itself shall be submitted to the jury, that they may judge whether there is evidence of malice on the face of it.'"

The question whether a letter or other communication, addressed by one party to another, is within the privilege of communication, depends not only upon the occasion that calls forth the publication, but also upon the character of the communication itself. A party may have a privilege and a protection in making a communication in regard to the qualities or character of another person, but if he abuse that occasion, and goes much beyond what is required or proper in his statements relating to that other person, the occasion will not protect him. A communication is only privileged within the rule when made in good faith, in answer to one having an interest in the information sought;

and it will be privileged, even if volunteered, when the party to whom the communication is made has an interest in it, and the party by whom it is made stands in such relation to him as to make it a reasonable social duty, or at least proper that he should give the information, as a just and reasonable means to guard the person receiving the information against an act or dealing that might be prejudicial to him. This appears to be substantially the result of the authorities, or of the best considered cases; though each case depends more or less upon its own special circumstances, and especially as those circumstances may reflect upon the relation of the parties, and the question of *bona fides* of the party making the communication. *Cockayne* v. *Hodgkisson,* 5 C. & P. 543; *Todd* v. *Hawkins,* 8 C. & P. 88; *Sunderlin* v. *Bradstreet,* 46 N. Y. 188; 2 Greenl. Ev., Sec. 421. This question has been recently considered by this court in the case of *Bailey* v. *Holland,* 7 App. D. C. 184; and also in a recent English case of *Hebdilch* v. *McIlwaine,* 2. L. R. Q. B. Div. (1894) 54, decided by the Court of Appeal, in which cases the general principle just stated is fully maintained.

The mere friendly relations of the parties being insufficient to create a duty on the part of the superintendent, Callahan, to write the letter to Murray, there was nothing in the case that justified or brought the voluntary communication within the rule of privileged communication; and the court below was entirely right in refusing to submit the question of what was claimed to be a privilege, to the consideration of the jury. *York* v. *Johnson,* 116 Mass. 482; *The Count Joannes* v. *Bennett,* 5 Allen, 169; *Krebs* v. *Oliver,* 12 Gray, 239; *Byam* v. *Collins,* 111 N. Y. 143. As was well said in the last-mentioned case, "every one owes a moral duty, not to become a volunteer in a matter in which he has no legal duty or personal interest, to defame another, unless he can find a justification in some pressing emergency."

Now, with the general principles that we have just stated kept in view, there can be but little difficulty in disposing

of the several assignments of error relied on by the defendant. The first error assigned, predicated of supposed error in the instructions granted at the instance of the plaintiff, has no ground of support on the facts of the case. It necessarily follows from what we have already said, that there was no question of privileged communication in the case; and the court below having so decided, there were no facts relating to such question to be submitted to the jury. The instructions granted fully submitted all the facts that in any manner reflected upon the question of the liability of the defendant company for the act of Callahan in writing the letter to Murray. The question whether Callahan wrote and mailed the letter to Murray in his character of general superintendent of the affairs of the defendant company, and in the ordinary course of his duties as such superintendent, was upon the whole evidence submitted to the jury, and, in addition to the instructions granted on the request of the plaintiff, the jury were further instructed upon the question of the defendant's liability and under what state of facts the defendant would not be liable for the act of Callahan in writing the letter. By the fifth prayer for instruction, and granted on request of the defendant, the court directed the jury, "that, if the jury shall find from the whole evidence that the letter set forth in the declaration was written by Callahan in reply to the letter in evidence signed by K. C. Murray and addressed to the Hon. John Callahan, and that the writing and publication thereof were the personal and independent acts of said Callahan in reference to the communication addressed to him personally (if the jury shall find that such communication was addressed to the said Callahan personally), and that the reply thereto set forth in the declaration was not written or published by the said Callahan in the course of his duties or service as general superintendent of the defendant company, and was not after such publication approved or ratified by the defendant (if the jury so find), then the

said Callahan is alone responsible for all the consequences of the writing and publication of said letter and the plaintiff is not entitled to recover in this action." And further, as if to multiply instruction, and to emphasize the contention of the defendant as to its nonliability for the act of Callahan in writing the letter, the court, by the eighth instruction asked and granted at the instance of the defendant, directed the jury "that in this case it is a question for the jury to determine whether the corporation defendant authorized the publication of the letter set forth in the declaration, and whether it ratified the publication of said letter after the same had been made, and whether said publication was made by its servant or agent in the course of his employment, and whether the writing and publication of said letter was within the scope of the duties of such servant or agent; and if the jury shall find from the whole evidence that the defendant corporation did not authorize the writing and publication of said letter, and did not ratify the same or the publication thereof after the same had been published, and that the writing and publication of said letter was not made by said Callahan within the scope of his duties or authority as general superintendent of the defendant company, then the plaintiff is not entitled to recover in this action." And, finally, the court, in lieu of the thirteenth prayer offered by the defendant, instructed the jury in terms that substantially covered the whole case, and which instruction was decidedly in support of the contention of the defendant. The instruction was in these terms: "In order for the plaintiff to recover in this action, the burden is upon him to prove to the satisfaction of the jury by preponderance of the evidence that said Callahan wrote and published the letter complained of for and on behalf of the defendant and in the course of his duties as general superintendent thereof, or that said defendant subsequently ratified and approved the said act of the said Callahan, directly or indirectly, and that the damages, if any, resulting to the plaintiff from

the publication thereof (the letter) arose from the publication of said letter by the defendant."

Now, with these instructions before them, it is hardly conceivable that the jury could be misled as to the ground upon which they might find their verdict for either plaintiff or defendant, as they might conclude from the whole evidence. The whole question of fact was fully and clearly presented to them; and under the instructions of the court there were but two material questions for their consideration and determination: 1st, whether the defendant was liable for the act of Callahan in writing and publishing the letter; and, 2d, if they should find for the plaintiff, what amount of damages should be awarded. With respect to the first of these questions, enough has already been said; and it only remains to examine the instructions of the court in respect to the principles upon which the damages could be assessed, in the event that the verdict was found for the plaintiff.

All question of special damages, as declared for in the declaration, was entirely eliminated from the case and withdrawn from the consideration of the jury by the second prayer offered by the defendant, and which was granted by the court. This instruction was founded upon the idea that there was an entire absence of evidence of any such special damage as that claimed in the declaration. But this left the declaration good for all such general damages as the nature of the wrong declared for would justify the jury in awarding the plaintiff as compensation merely. For the law is well settled that where the libel is actionable *per se*, as where the words employed imputed to the master of a vessel the want of skill, or that he was frequently drunk, and therefore unreliable and untrustworthy, the action is maintainable without either allegation or proof of special damages. *Irwin* v. *Brundwood*, 33 Law J. Ex. 257. Indeed, where the libel is in itself actionable, no proof of special damage is necessary to enable the plaintiff to re-

cover, although special damage be alleged. The plaintiff can not, in that case, however, any more than where the special damage is the gist of the action, gave evidence of any merely consequential damage which is not alleged in the declaration. *Herrick* v. *Lapham*, 10 Johns. 281–284. But where the libel is in itself actionable, no special damage need be laid or proved; the law in such case presuming that the publishing of the libel has in itself a natural and necessary tendency to injure the plaintiff. *Malachy* v. *Soper*, 3 Bing. N. C. 382. And where in an action for libel or slander the cause of action is proved against the defendant, the jury are not limited to nominal damages merely, though no evidence is given on behalf of the plaintiff; and where the libel is actionable without the averment of special damages, the jury may take into consideration not only the injury that has arisen, but that which may thereafter arise from the publication of the libel. *Ingram* v. *Lawson*, 6 Bing. N. Cas. 212; *Tripp* v. *Thomas*, 3 B. & Cr. 427; Mayne on Damages, 626. This is because no subsequently accruing injury from the libel would afford a new ground of action to the plaintiff.

The court below in its instructions to the jury was careful to limit the inquiry as to the measure of damages that could be allowed; and clearly defined the distinction between general and special damages in such cases. By granting the second prayer of the defendant, as we have already stated, all question of special damage for the possible rejection of the plaintiff in his application for the position of captain or commander of the oyster fleet of Virginia was put out of the case. And the court was careful to instruct the jury that there was no ground shown upon which exemplary damages could be allowed; and then told the jury that they should confine themselves, in considering the question of damages, if they should find for the plaintiff, to giving him what would fairly and fully compensate him for the injuries which he had suffered, taking into consideration the

different elements to which the court had referred. And the court then proceeded in its instruction, and said:

"And in that connection you should *give him only such damages,* if you find for him, as have accrued to him by the publication of this libel by the defendant. I mean by that that there is some evidence here tending to show that Capt. Davis himself read this letter to some friends, and you will remember the extent of that evidence. I do not undertake to say exactly what it is, but if you should be of opinion that the damages were increased by any publication he gave he would not be entitled to recover for any damage to him which his own publication of it occasioned. He would only be entitled to recover such damages as the publication by the defendant occasioned."

These restrictive and qualifying instructions, when read in connection with the general instruction upon the subject of damages, would seem to have guarded the rights of the defendant amply. By the general instruction on the measure of damages, the jury were directed that "in estimating the damages they should render their verdict for such sum as the jury believed from the evidence would fully and fairly compensate the plaintiff for the injury suffered by him by reason of the writing and sending of the said letter to said Murray, including injuries, if any, done thereby to the plaintiff in his occupation and calling as ship captain and pilot, and his mental suffering arising out of the statements and accusations contained in the said letter, and the tendency thereof to bring the plaintiff into disgrace and disrepute among the men of his calling and his friends and acquaintances and the community in general in which he resides."

It thus appears that the question as to the mode of assessing the damages, with the limitations and restrictions contained in the instructions to the jury, was most fairly submitted to the jury; and that there was no error in respect of any of the rulings of the court as to what was the proper measure of damages. To have granted the third and fourth prayers of the defendant would have tended to mislead the

jury rather than instruct them, in view of all the instructions given upon the subject of damages.

With respect to the sixth assignment of error relating to a question of evidence raised in the course of the trial, the record shows that the matter upon which the question arose was ruled out by the court, and that there is in fact no such question here as that attempted to be presented. The statement made by the plaintiff and produced and read, so far as it was intended by that means to prove the falsity of the libel complained of, was incompetent evidence, and when first produced the court restricted its admission to a single purpose, and did not allow it to prove the falsity of the libelous matter sued on. The counsel for the defendant appear to have understood that the object of the testimony of the plaintiff, in regard to the statement made and offered in evidence, was to prove the falsity of the libel sued on, and hence, without any plea of justification, but under the plea of not guilty, proposed to go into proof of the truth of the libelous matter; to which the plaintiff objected, and the objection being sustained by the court, the defendant noted an exception to the ruling. Whereupon, counsel for the plaintiff, to remove all question and difficulty upon the subject, in open court, withdrew from the record what was said by the plaintiff as to the truth of the statement produced by him and read in the hearing of the jury. The court then remarked: "That is considered out. I instructed the jury at the time that it was evidence of nothing, except so far as it might tend to show that Captain Davis attempted to bring to the attention of the board of directors this alleged libel." The defendant still claimed the benefit of the exception reserved; but it is manifest, that, as the subject matter upon which the exception was based was withdrawn from the record, the exception presents no question for review here.

Upon full review of this case, we find nothing to warrant a reversal of the judgment appealed from, and that judgment must be affirmed; and it is so ordered.

*Judgment affirmed.*