# DICKINS v. INTERNATIONAL BROTHER-HOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS et al.

### No. 9492.

United States Court of Appeals
District of Columbia Circuit.

Argued May 3, 1948.

Decided Oct. 18, 1948.

Mr. Thomas C. Bradley, of Washington, D. C., with whom Mr. Thomas C. Bradley, Jr., of Washington, D. C., was on the brief, for appellant.

Mr. Elisha Hanson, of Washington, D. C., with whom Mr. J. Albert Woll, Miss Letitia Armistead, Miss Jacqueline Wemple, and Mr. William K. Van Allen, all of Washington, D. C., were on the brief, for appellees.

Before WILBUR K. MILLER and PRETTYMAN, Circuit Judges, and SCHWEINHAUT, District Judge, sitting by designation.

WILBUR K. MILLER, Circuit Judge.

This is an appeal by Randolph Dickins, Jr., the unsucesssful plaintiff in a libel suit against International Brotherhood of Teamsters, Chauffeurs, Warhousemen and Helpers, and its president, Daniel J. Tobin.

In the summer and fall of 1944 the appellant, then twenty-three years of age and a lieutenant in the United States Navy, was an ambulatory patient at the Bethesda Naval Hospital, under treatment for fatigue. Being free for the evening of September 23, 1944, and having discovered that an old friend, Lieutenant Commander Suddeth, was stationed in Washington, he communicated with Suddeth and about 8:00 p. m. called on him at his apartment. About 9:00 p. m. Dickins and Suddeth each drank one rum highball. Suddeth apologized, Dickins said, because his supply of rum was then exhausted. Shortly after 10:00 o'clock they decided to visit the Statler Hotel, where they understood a dance for naval officers was held each Saturday night. They arrived at the hotel probably between 10:30 and 10:45 and proceeded to the mezzanine floor where Dickins said they inquired as to the location of the dance.

On the same evening the Teamsters' union held a banquet at the Statler Hotel at which the President of the United States was the guest of honor and the principal speaker. His address was completed at 10:22 p. m. and a few minutes after that the crowd left the banquet room and entered upon the mezzanine floor. Dickins and Suddeth became involved almost immediately in a political argument with certain of the banquet guests, and soon after they were engaged in a fight with a number of those persons. An assistant manager of the hotel, who was summoned, directed that the Shore Patrol be called. A naval policeman responded quickly and took Dickins and his companion to the Shore Patrol headquarters. There each made a written statement as to the affray and between 2:00 and 3:00 o'clock on the morning of Sunday, September 24, when the Patrol officers had ascertained that neither the hotel nor the union desired to prefer charges against them, they were released. A Shore Patrol vehicle took Suddeth to his apartment and returned Dickins to the Bethesda hospital.

The incident was not mentioned in the newspapers until October 1, 1944, when the Washington Times-Herald carried a story describing it as a brawl in which labor

leaders attacked the appellant and his companion, another young naval officer.[1]

On the following day, October 2, the appellant voluntarily held a press conference at which he gave to some thirty newsmen his version of the affair, which was to the same general effect as the article in the previous day's Times-Herald. He claimed that he and Suddeth had been attacked by members of the Teamsters' union. The interview was published in the Washington Evening Star on that day, and thereafter more than ten thousand articles in the pattern of the Star story appeared in newspapers throughout the country.

On October 5, 1944, a senatorial subcommittee began an inquiry for the purpose of determining whether a · formal investigation of the incident should be made by the full committee. Dickins' attorney filed with the subcommittee his client's affidavit, as well as an affidavit by Suddeth, both of which substantially reiterated the version of the brawl which Dickins had given to the reporters on October 2. The union filed with the subcommittee a number of counter-affidavits. Following this the subcommittee decided not to hold an investigation and did not release the affidavits for publication. Dickins' attorney, however, gave to the press on October 18 the affidavits of Suddeth and Dickins and these statements received wide publicity.

There appeared in the November, 1944, issue of "The International Teamster," official magazine of the Teamsters' union, an article entitled "Here's the True Statler Story!" which included seven affidavits of persons who had been present on the mezzanine floor of the hotel during the incident. The article and the affidavits accused the two naval officers of being drunk, of using abusive and unprintably foul language concerning the President of the United States, of making unprovoked assaults upon the banquet guests, and of forcibly stopping a woman passerby and demanding to know for whom she intended to vote for president. The magazine was sent to those on the regular mailing list, consisting of more than 400,000 teamsters and about 1,200 others, including all members of Congress, a number of colleges, libraries, newspapers and other periodicals. In addition, copies were received through the mail by two Washington reporters, one of whom said the magazine had not been sent to him before or since.

Early in November, 1944, Dickins instituted this suit in the District Court of the United States for the District of Columbia to recover $100,000 in actual damages and

---

[1] The following is an abbreviation of the Times-Herald article:

"Details of a free-swinging street brawl, in which labor leaders closely connected with Daniel J. Tobin attacked two young naval officers at the Statler Hotel following President Roosevelt's 'first' fourth-term campaign speech there last Saturday, are under secret investigation by the Navy Department, the Times-Herald learned last night.

"The fracas, it is reported, was precipitated when two men, said to be Tobin's bodyguards, accosted Lieut. Randolph Dickens, U. S. N., and a companion and demanded to know if they were going to vote · for their Commander-in-Chief in November.

\*    \*    \*    \*    \*    \*

"Despite an official screen of secrecy, despite White House orders to Third Precinct police to suppress all news of it, and despite personal summons of an officer of the Naval Shore Patrol by Presidential Secretary Steve Early, the following was presented to the Times-

Herald as a factual account of the incident:

"A party of Tobin unionists, jubilant over the acclaim the rank-and-file of the Teamsters' group had accorded the President's speech, encountered the officers in the lobby of the hotel.

"Two of the members of the party accosted the officers, both of whom are under doctor's care at the Bethesda Naval Hospital, and demanded to know if they 'were going to vote for their Commander-in-Chief in the November elections.'

"The officers first ignored the query, but when it was repeated several times, became angry and told the teamsters 'it was none of their damned business,' it was said.

"The fight followed. A man believed to be Tobin was caught on the nose by a wild blow from one of the officers and fell to the floor. Then two of the Tobin party grabbed Dickins while a third beat him, blackening his eyes so badly that several stitches were required to close the wound, it was reported."

$100,000 in punitive damages from the Teamsters' union and Tobin because of the publication to which reference has just been made. The defendants, who are appellees here, pleaded truth and privilege.

When the author of a libel writes under the compulsion of a legal or moral duty, or for the protection of his own rights or interests, that which he writes is a privileged communication unless the writer be actuated by malice.[2] The appellant testified that, before the publication of which he here complains, he himself released to the press his own charges that members of the union assaulted him and his companion. His act in so doing cast upon the union the moral duty and consequently conferred upon it the legal right to publish a reply which, even if it were false, was privileged unless the plaintiff proved the defendant knew it to be false or otherwise proved actual malice in the publication.

The trial judge correctly instructed the jury to determine first whether the charges against Dickins contained in the publication were substantially true; if they were, then they need go no further but simply find for the defendants. On the other hand, he informed the jury, if they should find those charges false, they should then take up the question of conditional privilege and determine the presence or absence of actual malice.[3]

After the jurors had been out several hours they sent to the presiding judge the following written communication:

"Your Honor: Is a person responsible for publications that grow out of a signed statement to the press?

"(Signed) Jury"

Upon receipt of this question the judge called counsel to the bench and discussed the matter with them. He closed the colloquy by saying, "This is simply a question of law which I shall answer 'Yes.' I do not see anything else to it. I shall hand to the reporter, for her notes, a copy of their note and my answer." No objection was made by counsel. The verdict of the jury was for the defendants and Dickins' motion for a new trial was in due course overruled.

Principal reliance for reversal is placed upon this theory: (a) the jury's question showed it had found the publication false and was considering the question of privilege; (b) privilege is lost when actual malice appears; (c) uncontradicted proof showed malice conclusively; (d) hence the jury, having found the accusations false, went contrary to the evidence and the court's instructions in basing its verdict up-

---

[2] White v. Nicholls, 1845, 3 How. 266, 44 U.S. 266, 286, 11 L.Ed. 591.

Whether a communication is privileged is a question of law for the court; whether its author abused the privilege, i. e., whether actual malice was shown, is a question of fact for the jury. Norfolk & Washington Steamboat Co. v. Davis, 1898, 12 App.D.C. 306, 325; Brice v. Curtis, 1912, 38 App.D.C. 304, 307; National Disabled Soldiers' League v. Haan, 1925, 55 App.D.C. 243, 247, 248, 4 F.2d 436, 440, 441.

[3] With respect to malice, the court said:

"The fact that the charges against the plaintiff may have been false would not itself be sufficient to show malice, but in determining whether the article was actually malicious you should consider all the evidence in this case; the character of the language of the publication itself and the subsequent publications by the defendant and the delivery of the issues of this paper to others than those who regularly obtained the paper; whether it was inspired in an earnest effort in defense of the members of the organization against charges, or whether it was inspired more by political or other purposes.

"Also you may consider the manner of obtaining the facts upon which the article was based; whether the writer of the article acted honestly; whether his statements were based upon information which he obtained from those whom he considered to be reliable persons, and taking all this into consideration determine whether or not in writing this article the writer of the article was inspired, as I said, by actual malice; that is, by personal hatred or an attempt to injure the plaintiff, or whether it was purely an article in defense of the charges and based upon information which was reasonably to be relied upon.

"I referred once or twice to the words 'burden of proof' and on this question of privilege, if you find that that existed, the burden would be upon the plaintiff to show that the article was actually malicious."

on privilege. This amounts to saying the issue of malice should not have been submitted to the jury; that the only question for that body was the truth or falsity of the publication.[4]

█ It may well be doubted whether the appellant can be heard to say the jury found the charges to be untrue, since a general verdict, such as this one was, ordinarily is held to have decided all issues of fact in favor of the prevailing party.[5] Giving the appellant the benefit of such doubt as exists with respect to that question, but without deciding it, we shall proceed to consider his argument that malice was proved so thoroughly, convincingly and uncontradictedly, that the question of its existence should not have been left to the jury.

Malice was decisively shown, the appellant asserts, (a) by the character of the article; (b) by the cumulative publications in the two succeeding issues of "The International Teamster" which contained additional affidavits of the same tenor as those in the November issue; (c) by delivery of the November magazine to others than union members, and particularly by its delivery to the two reporters.

█ We do not agree that the nature of the article conclusively showed malice in its author. Its strongest language is that which the affidavits embraced in it attributed to the appellant. Moreover, it has been said that honest indignation and strong words are not evidence of malice.[6] Nor do we think the appearance of additional affidavits in the December and January numbers necessarily demonstrated beyond question that the November article was actuated by malice; such cumulative publication did not approach in quantity or distribution the thousands of publications which the appellees were trying to refute.

█ There was no evidence of an expansion of the mailing list for the November "International Teamster" and there was, on the other hand, testimony that it was not enlarged. In our view, the failure to reduce the normal mailing list so that only union members would receive the November issue falls far short of conclusively demonstrating malice in the publication and distribution.[7] We think it equally illogical to say that sending the magazine to the two reporters, out of a total mailing of nearly 450,000 copies, was a decisive showing of malice.

█ We wrote in National Disabled Soldiers' League v. Haan, 1925, 55 App.D. C. 243, 248, 4 F.2d 436, 441:

"If the plaintiff fails to offer evidence of an extrinsic character to prove actual malice on the part of the defendant, in the publication of a libel on a qualifiedly privileged occasion, and if the language of the communication and the circumstances attending its publication by the defendant are as consistent with the nonexistence of malice as with its existence, there is no 'issue for the jury, and it is the duty of the trial court to direct a verdict for the defendant." [8]

Here the language of the communication and the circumstances attending its publication were as consistent with the non-existence of malice as with its existence. Whether there was other evidence which

---

[4] Indeed, the appellant expressly so contends by saying, "There was a great amount of direct evidence, undisputed and uncontradicted, which took away from the jury the question of privilege and left only the question of determining the truth or falsity of the libel."

[5] Hart v. Capital Traction Co., 1910, 35 App.D.C. 502; Lehigh Valley Coal Co. v. Lukaszunas, 2 Cir., 1916, 230 F. 792; Erie Ry. Co. v. Schleenbaker, 6 Cir., 1919, 257 Fed. 667; Rowe v. Safeway Stores, Inc., 1942, 14 Wash.2d 363, 128 P.2d 293; Lord v. Hercules Powder Co., 1946, 161 Kan. 268, 167 P.2d 299.

[6] Massee v. Williams, 6 Cir., 1913, 207 F. 222, 230.

[7] Coleman v. MacLennan, 1908, 78 Kan. 711, 98 P. 281, at page 292, 20 L.R.A.,N.S., 361, 130 Am.St.Rep. 390.

[8] See also Montgomery Ward & Co. v. Watson, 1932, 55 F.2d 184, 187, where Judge Parker, speaking for the Fourth Circuit, said:

"Since, therefore, the occasion was privileged and the publication not excessive, plaintiffs are not entitled to recover, unless they can establish actual malice as the motive of the publication. In the case of a publication not privileged of words actionable per se, malice need not be shown, but is implied in law from the publication itself. In the case of a privileged communication, however, express

justified submitting to the jury the question of its existence, we need not decide; the issue was in fact submitted, and resolved by the jury against the appellant. Suffice it to say that certainly there was no proof of express malice so convincing and conclusive as to require the question to be withheld from the jury and to be answered by the court in appellant's favor.

The appellant also argues that it was error for the court to answer "Yes" to the jury's question, or to answer it at all. He says he did not give a signed statement to the press and, therefore, there was no basis in the evidence for the jury's question. The argument overlooks the affidavit of the appellant which his attorney released to the newspapers on October 18. So there was a basis in the evidence for the question and the court's answer to it was correct. Moreover, the appellant made no objection at the time the answer was given, and he was not prejudiced by the question or the answer.

All other assignments of error have been examined but are not regarded as substantial enough to require discussion.

Affirmed.

---

malice as distinguished from malice in law must be shown; that is to say, if the occasion be privileged, the plaintiff may not recover, although he proves that defendant used language actionable per se and that same was false, unless he goes further and shows that in using same defendant was moved by actual malice, such as ill will, spite, grudge, or some ulterior motive."