## HOXSEY v. FISHBEIN et al.
### No. 3803.

United States District Court
N. D. Texas, Dallas Division.
March 18, 1949.

W. C. Austin, of Fort Worth, Tex., James H. Martin, of Dallas, Tex., and Herbert K. Hyde, of Oklahoma City, Okl., for plaintiff.

W. L. Matthews, of San Antonio, Tex., McCauley & Henry and Charles Henry, all of New York City, and Dwight L. Simmons, of Dallas, Tex., for defendants.

ATWELL, Chief Judge.

The plaintiff operated in Dallas, Texas, in valuable property which he owned, a cancer clinic, in which he employed a licensed doctor, nurses, and approximately twenty employees. His business had been in operation in Texas for a number of years.

The defendant, an employee of the American Medical Association, wrote articles which were published in some of the other defendants' newspapers, and this suit seeks to recover $500,000 actual damages and $500,000 punitive damages.

The article is headed, "Medical Hucksters," and charges the plaintiff with being a "charlatan," and a "quack." It also charges his father with having died of a cancer, and that he, the father, used the same remedies. It also charges that the plaintiff "hood-winked" jurists.

The Texas statute—see Brinkley v. Fishbein, 5 Cir., 110 F.2d 62, allows the defense of the truthfulness of the accusations, and a reasonable and fair comment or criticism of matters of public concern published for general information. See also Fletcher v. Evening Star Newspaper Co., D.C.Cir., 114 F.2d 582.

The statute, itself, is shown in arts. 5430 to 5433, R.S.Tex.1925, Vernon's Ann.Civ. St. art. 5431.

Even though charges are libelous per se, the defense provided for in the statutes is available. Wheless v. W. L. Davis & Son, Tex.Civ.App., 122 S.W. 929; Nunn v. Webster, Tex.Com.App., 260 S.W. 157; Dickins v. International Brotherhood, 171 F.2d 21.

Art. 5432 of the Acts of 1927, 40th Legislature, chapter 80, paragraph 2, Vernon's Annotated Civil Statutes, gives a newspaper a reasonable and fair comment or criticism of matters of public concern published for general information.

A "quack" is defined as an "ignorant or fraudulent pretender to medical skill." "Charlatan," seems to be somewhat of a synonym of that word.

This much has been said as a sort of preface in order that there may be an early understanding of the wide range of the battlefield.

The plaintiff introduced the articles complained of. Fishbein, Hearst, Sr., Engle, and the American Medical Association, were dismissed because no valid service could be had on them.

The plaintiff then went at once to testimony by introducing over fifty witnesses who testified that they had been treated for cancer at his clinic and that they had been cured. In many instances, photographs were introduced showing their condition when they went, and their condition after treatment.

He also offered testimony tending to show that surgery, and particularly x-ray and radium would produce cancer. Some of the patients stated they had been treated by other physicians and that their condition had either grown worse or no better, then they went to the plaintiff's clinic and were cured. Likewise, he presented testimony tending to show that the American Medical Association had sent its investigators into Illinois and that records concerning his father's death certificate and graduation as a veterinarian had disappeared. That the death certificate would have shown that the father did not die of cancer, but of erysipelas, but that another death certificate had taken its place which was prepared eight or ten years after the father died.

Testimony was also offered tending to show that Fishbein had continued his constant activity, as an officer of the American Medical Association, against the plaintiff and had engaged in writing and assisting in the final wording of the published articles as well as in the institution of criminal proceedings against the plaintiff, of a minor nature, in Illinois and some other states.

Plaintiff also offered testimony tending to show that the limit of his charge was $300 and that in many cases there was no charge whatever. This testimony was pertinent because of the statement in the publications that the plaintiff was after money.

As a justification, under the statute, for the publications, the defendants offered a number of physicians from various sections of the nation who testified that medicines such as the plaintiff caused to be used, and such treatment as he caused to be prescribed for those who appeared at his clinic, would not and could not result in the cure of cancer.

Upon cross-examination, some of them admitted that surgery and x-ray, particularly x-ray, would cause cancer if not used skillfully.

The defendants offered testimony which showed that the plaintiff had performed at least one operation, and that while the operation was minor in its nature, it included the treatment of the open wound with a powder such as had been used under his direction, and that the patient died of poisoning shortly thereafter.

The two schools of medicine, to wit, the homeopathic and the allopathic, were defended respectively by the plaintiff and the defendants. Such ingredients of the salve, powder and tonic as the plaintiff caused to be used were named in the homeopathic pharmacopoeia.

Upon the general question of the pursuit of the plaintiff by the defendant, Fishbein, as an agent of the American Medical Association, repeated activities in different sections of the country were shown inimical to the plaintiff, and the plaintiff's offer to secure, by challenge and by letters and telegrams, agreements by Fishbein and the American Medical Association to appear at his clinic and investigate his work, also asking the appearance in joint debates arranged by local communities, none of which were acknowledged or answered by the defendants.

The plaintiff employed two different doctors at different times, in his Dallas clinic. Those doctors were regularly licensed physicians.

I think it may be fairly said that from the testimony it may be concluded that there is a skin cancer, and an internal cancer—the latter being the more deadly.

This rather general survey of the battlefield shows something of its unusual size, and would, perhaps, be justified by more detail since approximately eighty witnesses and eighty written exhibits were introduced and a record resulted in approximately two thousand pages.

The plaintiff courted publicity, and he published a pamphlet in which he detailed that the remedies which were being used at his clinic were the result of his father's observation of a horse which had a cancer on its head, and that it would, immediately

go to a certain tank of water when it was free and that water seemed to alleviate the pain of the sore.

This recital is made in the place of the rather lengthy oral opinion of the court indulged at the conclusion of the argument and the pronouncement of a finding of facts and the judgment.

■ Those facts, summarized, are: That the method pursued by the plaintiff consists of healing neither by radium, x-ray nor surgery, but by the application of external medicines and solutions, and by internal medicines. That the plaintiff has no license to practice medicine. That his father did die of a cancer, and that his father was a veterinarian and that the father used as a virgin healer remedies over which the plaintiff and his brothers and sisters had a lawsuit because they charged that he appropriated those remedies, and they sought a large sum. That the charge in the publication that the plaintiff had "hood-winked" jurists, was not true. That the publication of the article has not damaged the plaintiff, except nominally, since his source of revenue arises from publicity in which he, himself, engages, not only by advertising but by article writers and by such controversies as he can provoke with the American Medical Association, and by making the people believe that it is hounding him and would like to drive him out of business. That there is no substantial decrease in his earnings by reason of the publication. That there was no malice in the case, and that the publication arose from a mistaken sense of public duty. That there is no constitutional right nor statutory right for an individual or a publication to assume the position of censor over another's conduct. If there are two places for treatment of a trouble, the individual has a right to make his choice. The question of practicing without a license, is in the hands of public officials. The matter of malpractice or negligence, is in the hands of the individual who has suffered, and he has a civil remedy for damages.

Conclusions of law were found to the effect that the plaintiff was entitled to recover the nominal sum of $1.00 as to himself and $1.00 for the slander of his father.