## MELLON v. BREWER.

(Court of Appeals of District of Columbia. Submitted January 4, 1927.   Decided March 7, 1927.)

### No. 4497.

**1. Evidence ⬤⟿44—Court will take judicial notice that defendant in action for libel was Secretary of the Treasury at time of publication complained of.**

In action for libel, court will take judicial notice that defendant, at time of publication complained of, was Secretary of the Treasury of the United States.

**2. Libel and slander ⬤⟿39—Letter from Secretary of the Treasury to President concerning investigation of Treasury Department by plaintiff held privileged.**

Letter from Secretary of the Treasury of the United States to the President concerning an investigation of the Treasury Department, which plaintiff had been conducting for nearly three years without progressing beyond the point of suspicion, *held* a privileged communication.

**3. Libel and slander ⬤⟿39—Motive underlying discharge of official duty as regards libelous communications is not material.**

The motive underlying the discharge of an official duty as regards libelous communications is not material, since otherwise freedom which ought to exist in discharge of public duty might be seriously restrained.

**4. Libel and slander ⬤⟿50½—Letter from Secretary of the Treasury to President, challenging plaintiff's good faith in conducting investigation of Treasury Department and characterizing charges as unfounded, held not abuse of writer's privilege.**

Letter from Secretary of the Treasury of the United States to the President relative to an investigation of the Treasury Department, which plaintiff had been conducting for nearly three years without progressing beyond the point of suspicion and deduction, in which the writer challenged plaintiff's good faith and characterized the charges as unsound, *held* not unwarranted, nor an abuse of the privilege enjoyed by the Secretary.

**5. Libel and slander ⬤⟿39—That Secretary of the Treasury gave communication to President to newspapers with President's presumed approval held not basis for action for libel.**

In action for libel, based on letter from Secretary of the Treasury to the President, challenging plaintiff's good faith in conduct of investigation of Treasury Department, defendant's giving of such communication to the newspapers after its receipt by the president and with his presumed approval *held* not a publication resulting in liability.

Appeal from Supreme Court of the District of Columbia.

Action by Charles B. Brewer against Andrew W. Mellon.   From an order overruling a demurrer to the declaration, defendant appeals.   Reversed and remanded.

F. J. Hogan, of Washington, D. C., for appellant.

R. L. Merrick and C. B. Brewer, both of Washington, D. C., for appellee.

Before MARTIN, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

ROBB, Associate Justice.   This is a special appeal to review an order of the Supreme Court of the District of Columbia, overruling a demurrer to the declaration in an action for an alleged libel, in which damages in the sum of $500,000 are claimed.

The plaintiff, according to the averments of his declaration, had been an employee and officer of the government for many years, having served in the capacities of assistant draftsman, draftsman, and chief draftsman in the Navy Department, technical assistant in the Navy Department assigned to duty with the Department of Justice, Attorney in the Department of Justice, and, from about the 5th day of September of 1921 until the 31st day of March of 1925, a special assistant to the Attorney General, in which latter position he received a salary of $5,000 per year. In the month of March, 1921, "he was assigned to and entrusted with the investigation, in the Treasury Department of the United States and elsewhere, of supposed fraudulent duplications and other frauds in the counterfeiting, copying, falsification, sale, and disposal of bonds and other securities of the United States, and other instruments and writings evidencing the public indebtedness of the United States, and on or about the 9th day of June, A. D. 1924, the plaintiff was assigned as counsel for the select committee to investigate the preparation, distribution, sale, payment, retirement, surrender, cancellation and destruction of government bonds, and other securities, * * in which capacity plaintiff served until the expiration of said committee on March 4, 1925."   As a result of the assignment to make investigation in the Treasury Department and else-

where, plaintiff made and caused to be made "an extensive, exhaustive, and far-reaching investigation of said alleged irregularities, duplications, frauds, and crimes, and as a result and because thereof plaintiff also prepared and submitted, as was his duty so to do, at various times, in writing, reports to the President of the United States, and to the Attorney General of the United States, his superior officers, and particularly a report to the Attorney General of the United States, dated on, to wit, the 15th day of January, A. D. 1924," and on March 2, 1925, the select committee submitted a report to the House of Representatives. In all his reports, plaintiff commented fairly and impartially and without bias, prejudice, or malice upon the facts and circumstances disclosed, and the conclusions and recommendations made in his reports were his honest and sincere opinions, convictions and beliefs. His conduct as counsel for the congressional committee is alleged to have been of the same character.

Yet the defendant, it is charged, well knowing the premises, but contriving and wrongfully and maliciously intending to injure the plaintiff in his good name, fame, credit, and reputation, and to bring him into public scandal, infamy, and disgrace, to injure him in his employment, profession, and vocation, and to bring him into public contempt, ridicule, distrust, and hatred, "did, on or about the 3d day of March, A. D. 1925, falsely, wrongfully, wickedly, and maliciously compose and cause to be composed, of and concerning plaintiff individually, and of and concerning plaintiff as a public officer and employee as aforesaid, a certain false, scandalous, malicious, and defamatory libel in the form of a letter addressed to the President of the United States of America, which the said defendant published and caused to be published, in the District of Columbia and elsewhere, by sending copies thereof to certain newspapers printed and published in the District of Columbia and elsewhere." The names of the newspapers are then mentioned, and this list is followed by a copy of the "letter" itself.

The communication in question is headed "Treasury Department, Office of the Secretary," under date of March 3, 1925, is addressed to the President, and signed "A. W. Mellon, Secretary of the Treasury." After referring to the fact that there had been submitted to Congress by the special committee a majority report, with one member of the committee filing a minority report "expressing complete disagreement with the commit-

tee's findings, and that the chairman of the committee had filed a separate report, the Secretary continued: "The committee's report, for the most part, is hardly more than a repetition of charges made by Mr. Charles B. Brewer (the plaintiff), a special assistant to the Attorney General, dated January 15, 1924. Mr. Brewer's charges were, in turn, substantially a repetition of charges made in 1920 by Mr. J. W. McCarter, former Assistant Register of the Treasury under the Democratic administration. These charges are familiar to you, to members of Congress, and to the public generally. I shall not repeat them in this communication. Briefly, they allege that fraud has existed in connection with government bonds."

The communication then states that, when the charges were made by Mr. McCarter in 1920, they were thoroughly investigated by the then Secretary Houston, who publicly stated in two letters that they were without foundation. In April of 1921 McCarter again presented his charges to a member of Congress, who referred them to the Department of Justice, and plaintiff then began his activities. "Mr. Brewer devoted nearly three years to an investigation of the McCarter charges, and during that period made several reports to the Department of Justice, which indicated, in substance, that he suspected irregularities, but could not prove them. In these interim reports he usually included an appeal for more time in which to determine the facts. In October, 1923, after 2½ years had elapsed and Mr. Brewer still claimed his inquiry was incomplete, you designated Mr. Charles G. Washburn, an attorney at law of Worcester, Massachusetts, as your personal representative to consult with Mr. Brewer and to ascertain what facts he had developed. The situation, as disclosed by Mr. Washburn's study of the matter, was much the same as in preceding years. Mr. Brewer stated that he had not developed all the facts, and that he desired more time to present his 'proof.' Mr. Washburn advised you of the situation, and Mr. Brewer was given three additional months in which to complete his investigation. Having already spent 2½ years on the matter, certainly it was reasonable to suppose that this would be sufficient to enable him to finish any remaining phases of his work. Accordingly, it was arranged between Mr. Brewer and Mr. Washburn that, on January 15, 1924, Mr. Brewer should submit his final report."

The communication then refers to the filing of the report by the plaintiff with the Attorney General under date of January 15,

1924, and continues: "It contained no evidence which could in any wise be construed as a justification of the charges. As an investigator of the Department of Justice, it was Mr. Brewer's duty to ascertain and determine whether the charges were true or untrue. He did neither. His report was merely a reiteration of the charges, with embellishments, and with the comment in each instance that further investigation would develop the facts. Mr. Brewer's report was referred to the Treasury, and in my letter to you of April 26, 1924, I answered in detail all his specific charges. I stated then, and I repeat here, that there have been no fraudulent duplications or overissues of the public debt, and that the charges are absurd. There were some mechanical and clerical errors in the preparation and recording of the enormous volume of war-time securities, and there were some petty thefts of retired securities from the files. The mechanical and clerical errors did not result in any loss to the government, while the thefts of retired securities from the files have involved a loss to the United States of only $13,100 out of approximately $100,000,000,000, principal amount of securities retired by the Register of the Treasury during the period 1917 to 1922. Any fair-minded person will agree that this is a remarkable record. The wonder is that, considering the frailty of human nature and the war-time conditions under which most of the work was performed, the errors were so few and the actual losses to the United States so insignificant."

The communication then recites that in March of 1924 the House of Representatives passed a resolution authorizing the appointment of a committee to investigate the Brewer charges, and that "the discussion in Congress clearly indicated that those who sponsored the resolution were inspired by Brewer, who had given his charges wide publicity in a suit brought by him in the Supreme Court of the District of Columbia against his own department head. The committee promptly designated Mr. Brewer to assist it in conducting the investigation. Thus Mr. Brewer, having made the charges which resulted in the passage of the resolution, has occupied the triple rôle of investigator of his own accusations, prosecuting attorney, and advisor to the jury. Naturally he presented only such information and only such witnesses as in his opinion would tend to establish his charges. He certainly had no interest in the truth, if it were inconsistent with the charges upon which his employment depended. At the beginning of the committee's investigation, nearly a year ago, the Treasury requested permission to review the testimony of all the witnesses, including Mr. Brewer, and to cross-examine them, and this request was frequently repeated. Notwithstanding this, nearly all the witnesses were interviewed in secret executive session, and, although there has been ample time, the Treasury was denied the privilege of hearing, or even seeing a transcript of their testimony, or of cross-examining them. The Treasury was not given an opportunity to cross-examine Mr. Brewer, which would have enabled it to show conclusively wherein he had evaded or distorted the facts."

The Secretary then states that the Treasury Department had at all times held itself in readiness to co-operate with the committee in every possible way and repeatedly assured the committee of its willingness to furnish the facts of any matter under consideration. At the same time it had pointed out the injustice of accepting the testimony of witnesses, many of whom were employees with fancied grievances, who could not in the nature of things have had full knowledge of the facts, without permitting the Treasury to cross-examine them or answer their testimony. The communication concludes as follows:

"The committee's inquiry has been under way for nearly a year and its report has been made public. The report is substantially a reiteration of the McCarter-Brewer charges with the exception that there are added certain charges relating to the transaction of the War Finance Corporation in Liberty Bonds during the period 1918 to 1920, which were completely and conclusively refuted in a public hearing on October 25, 1924, and in my letters to the committee already referred to.

"The accusers of the Treasury, therefore, are as far now from proving their charges as they were in 1920. Mr. Brewer undertook to investigate the McCarter charges, and after 2½ years merely repeated them and admitted that he could not prove them to be true. The special congressional committee then undertook to investigate Mr. Brewer's charges, and after the lapse of a year has merely repeated many of the same charges and has developed no evidence to support them. Certainly, 3½ years of fruitless investigation should be sufficient to demonstrate that the charges are baseless. The charges started with a great conspiracy and 'hundreds of millions' in fraudulent securities, but during the investigation these general charges have grown less and less, until

now the only specific evidence of fraud presented is the theft of $13,100 of paid securities and their second presentations, the facts concerning which the Treasury itself made known. This is not a duplication of securities, but a duplicate payment of the same securities.

"The charges, for the most part, relate to transactions which took place before my administration of the Treasury. I feel that the handling of the tremendous volume of war-time securities was exceptionally well conducted by the employees of the Treasury, and I think the public should know that the charges are unworthy of further consideration."

[1] While the declaration does not in terms aver that Mr. Mellon, at the time of the writing and publishing of the communication forming the basis of this action, was Secretary of the Treasury of the United States, the fact sufficiently appears and is conceded. Moreover, it is a fact of which the court would take judicial notice. Backus Steam Heater Co. v. Simonds, 2 App. D. C. 290; Ry. Co. v. Winans, 17 How. 31, 15 L. Ed. 27. [2] The defense of the Secretary is that the communication was privileged, because it was an official communication from the head of an executive department to the President of the United States; and, second, because it was published in the Congressional Record of the United States prior to the publication in the newspapers. Counsel for the plaintiff, on the other hand, contend, first, that, even if the letter was an official communication, the Secretary exceeded any privilege he might have had by sending it to the newspapers for publication; and, second, that the publication of the letter in the Congressional Record occurred after publication by the Secretary.

The declaration discloses that for a period of 3½ years Mr. Brewer conducted an investigation, "in the Treasury Department of the United States and elsewhere, of supposed fraudulent duplications and other frauds in the counterfeiting, copying, falsification, sale, and disposal of bonds and other securities of the United States," and that he submitted written reports to the President of the United States and to the Attorney General of the United States, and that the charges were the subject of investigation and report by a committee of Congress. It thus appears that the efficiency, and to some extent at least the integrity, of the Treasury Department had been seriously challenged, and that public confidence in that department might have been impaired. Not only

was the head of the department and the President interested, but the matter was of vital concern to the public. These charges had been given wide publicity, and it may be assumed that the President desired from the head of the department involved a comprehensive statement of the facts as they appeared to him. Even though the President had not requested such a statement or report, it certainly was not beyond the scope of the Secretary's duty and authority to submit one. Moreover, failure on the part of the defendant to make a report to the President might have given rise to or justified the implication that the charges were not without foundation.

[3] The motive underlying the discharge of an official duty is not material. "Public policy affords absolute protection and immunity for what may be said or written by an officer in his official report or communication to a superior, when such report or communication is made in the course and discharge of official duty. Otherwise the perfect freedom which ought to exist in discharge of public duty might be seriously restrained. * * * Of course, when a party steps aside from duty and introduces into his report or communication defamatory matter wholly irrelevant and foreign to the subject of inquiry, a different question is presented." De Arnaud v. Ainsworth, 24 App. D. C. 167, 178 (5 L. R. A. [N. S.] 163).

In Spalding v. Vilas, 161 U. S. 483, 498, 16 S. Ct. 631, 637 (40 L. Ed. 780), the court said: "We are of opinion that the same general considerations of public policy and convenience, which demand for judges of courts of superior jurisdiction immunity from civil suits for damages arising from acts done by them in the course of the performance of their judicial functions, apply to a large extent to official communications made by heads of executive departments when engaged in the discharge of duties imposed upon them by law. The interests of the people require that due protection be accorded to them in respect of their official acts. * * * In exercising the functions of his office, the head of an executive department, keeping within the limits of his authority, should not be under an apprehension that the motives that control his official conduct may, at any time, become the subject of inquiry in a civil suit for damages. It would seriously cripple the proper and effective administration of public affairs, as intrusted to the executive branch of the government, if he were subjected to any such restraint. He may have legal authority to act, but he may

have such large discretion in the premises that it will not always be his absolute duty to exercise the authority with which he is invested. But, if he acts, having authority, his conduct cannot be made the foundation of a suit against him personally for damages, even if the circumstances show that he is not disagreeably impressed by the fact that his action injuriously affects the claims of particular individuals."

[4] But it is insisted, even if it be assumed that the report to the President was of an official character, the Secretary has interjected defamatory matter wholly irrelevant and foreign to the subject under discussion, so that there has been such abuse of the privilege as to place the communication beyond the rule and to destroy the general immunity. The basis for this contention is the challenge of plaintiff's good faith and the characterization of the charges as unfounded. When it is considered that, after the plaintiff had been engaged in conducting an investigation for a period of almost three years, and had not, according to the Secretary, progressed beyond the point of suspicion and deduction; that the President had designated a disinterested and presumably capable attorney to consult with Mr. Brewer and ascertain what facts he had developed, after which Mr. Brewer had requested three additional months, and thereafter submitted a report to the Attorney General, which, in view of the Secretary, contained no evidence justifying the charges; that this report was referred to the Treasury; that the Secretary answered the report in detail, stating that out of approximately $100,000,000,000, principal amount of securities retired by the Register of the Treasury during the period 1917 to 1922, there had been a loss of only $13,100; that, notwithstanding all this, the plaintiff persisted, and inspired a congressional investigation, according to the Secretary, by a committee for which he was counsel; that no opportunity was offered the Treasury to cross-examine witnesses or make explanation or defense—we say that, when all these circumstances are considered, the reasons for the Secretary's comment become apparent. The communication relates exclusively to the charges, to the plaintiff's connection therewith, and to the views of the Secretary as to the absence of any real foundation for such charges. Whether the views expressed by the Secretary are correct or incorrect is not a controlling factor. The question is: Was he justified, in the circumstances, in expressing those views? We think he was.

[5] In the absence of any averment that this communication was published prior to its being sent to the President, to whom it was addressed, we may assume that it was not. Certainly we would not be justified in assuming that the head of a department of the government and member of the Cabinet would make public such a communication or report in advance of its receipt by the President, or without the approval of the President. And, since publication of this official communication or report by the President would not have formed the basis of an action for libel, we are unable to perceive why its publication under the presumed direction of the President could have any other effect.

It is conceded in the briefs of the parties that this communication appeared in the Congressional Record of March 3, 1925, alleged in the declaration as the date when copies of the communication were furnished certain newspapers. Counsel for the plaintiff contend that the giving of the communication to the newspapers must have preceded the publication in the Congressional Record. Under the views already expressed, we deem it unnecessary to determine this question. But see De Arnaud v. Ainsworth, 24 App. D. C. 167, 186, 5 L. R. A. (N. S.) 163.

The judgment is reversed, with costs, and the cause remanded.

Reversed and remanded.