William G. BARR, Appellant,

v.

Linda A. MATTEO, Appellee.

William G. BARR, Appellant,

v.

John J. MADIGAN, Appellee.

Nos. 13217, 13218.

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 12, 1956.

Decided May 2, 1957.

Danaher, Circuit Judge, dissented.

Mr. Paul A. Sweeney, Atty., Dept. of Justice, with whom Asst. Atty. Gen. George C. Doub and Messrs. Oliver Gasch, U. S. Atty., and Joseph Langbart, Atty., Dept. of Justice, were on the brief, for appellant.

Mr. Byron N. Scott, Washington, D. C., with whom Mr. Richard A. Mehler, Washington, D. C., was on the brief, for appellees.

Before EDGERTON, Chief Judge, and FAHY and DANAHER, Circuit Judges.

EDGERTON, Chief Judge.

In 1953 the defendant Barr was Acting Director of the Office of Rent Stabilization, a branch of the Economic Stabilization Agency. The head of the Agency was the Director of Economic Stabilization. The plaintiffs Madigan and Matteo were employees in the Office of which the defendant was Acting Director. A terminal-leave plan which the plaintiffs had sponsored in 1950 was under criticism in Congress in 1953. The defendant had disapproved of the plan.

Without his knowledge, his secretary signed the defendant's name to a letter to a Senator defending the plan. The plaintiff Madigan had drafted the letter. When the defendant learned that the letter had gone out over his signature, he issued a press release in which he said his first act of duty would be to suspend the plaintiffs, the officials responsible for the terminal-leave plan, and that although he "was advised" the plan was legal, he thought it "violated the spirit of the Thomas Amendment [64 Stat. 768]" and he "violently opposed it".

The plaintiffs sued the defendant for libel. The verdict and judgment were for the plaintiffs. The defendant appeals on the ground that he had an "absolute immunity or privilege" in publishing the press release.

We agree with the District Court in overruling that contention. The defendant's decision to suspend the plaintiffs for what he thought, mistakenly or not, was sufficient cause, and his execution of any documents appropriate to that end, were probably within his general line of duty. If so, a letter to his official superiors explaining his decision would also have been within his general line of duty. Cf. Farr v. Valentine, 38 App.D.C. 413. So would an explanation addressed to the plaintiffs or to their representative. Newbury v. Love, 1957, 100 U.S.App.D.C. ——, 242 F.2d 372. But in explaining his decision to the general public, the defendant went entirely outside his line of duty. If such an officer were to do such a thing in bad faith or with a bad motive, no sufficient public interest would require that he be protected. If the defendant had been a Cabinet officer, his public explanation might have been absolutely privileged. "It has been held that a Cabinet officer is absolutely privileged to publish defamation, not only in doing his duty but also in discussing it; his defamation, to be protected, need only have 'more or less connection with the general matters committed by law to his control or supervision'." But this is because

"Cabinet officers have political functions, and public interest is thought to require that they be not restrained by fear of libel suits from publicly explaining their acts and policies." Colpoys v. Gates, 73 App.D.C. 193, 194, 118 F.2d 16, 17. We do not suggest that this principle is limited to Cabinet officers. We have no present occasion to consider whether it would apply, e. g., to the Director of Economic Stabilization, who was appellant's official superior, or to the Chairman of the Atomic Energy Commission, or to other officers whose positions are comparable to those of Cabinet officers. Appellant's position was not of that sort. We held in Colpoys that a United States Marshal was not absolutely privileged to defame his subordinates in publicly explaining his reasons for dismissing them. Neither, we think, was an Acting Director of the Office of Rent Stabilization.

 In general, "When the author of a libel writes under the compulsion of a legal or moral duty, or for the protection of his own rights or interests, that which he writes is a privileged communication unless the writer be actuated by malice." Dickins v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers, 84 U.S.App. D.C. 51, 54, 171 F.2d 21, 24. In the District Court the defendant Barr claimed that if his press release was not absolutely privileged, it was qualifiedly privileged by reason of this principle. However, on this appeal he has waived this claim. His brief states the "Question Presented" as follows: "Whether the Acting Director of the Office of Rent Stabilization should be accorded absolute immunity in a suit for libel for allegedly defamatory statements made by him in a press release, issued on Thursday, February 5, 1953, announcing his intention to suspend two named employees of the agency on Monday, February 9, 1953, and setting forth his reasons for taking that action." The entire "Statement of Points" in his brief is as follows: "The District Court erred in denying the defendant's respective motions to dismiss and for a directed verdict which were based on the defense of absolute immunity or privilege."

The waiver of the claim of qualified privilege was informed and deliberate. The appellant was represented by eminent counsel. An Assistant Attorney General of the United States, the United States Attorney for the District of Columbia, and two attorneys of the Department of Justice, all signed appellant's brief. All have now filed a memorandum which contains this summary of the matter: "Appellant's brief, in conformity with Rule 17(c) (7), set forth in the Statement of Points only the contention that the District Court erred in denying appellant's respective motions based on the defense of absolute immunity or privilege. Similarly, the Question Presented posed only this question, and the brief discusses this case only in terms of the applicability of absolute immunity as a defense. Finally, counsel for appellant, on October 12, 1956, disclaimed in open court any intent to urge any error on the part of the District Court other than its failure to accord to appellant the defense of absolute immunity or privilege."

This court's Rule 17(c) (7), [28 U.S. C.A.] requires that appellant's brief state "the points on which appellant intends to rely". Rule 17(i) provides that "Points not presented according to the rules of the court, will be disregarded, though the court, at its option, may notice and pass upon a plain error not pointed out or relied upon." This exception for "plain error" protects our authority to deal, in the interest of justice, with a point counsel have overlooked. In the absence of extraordinary circumstances the exception should not be applied, in a civil case, to a point that eminent counsel, for strategic or other reasons, have deliberately chosen to waive. Accordingly we do not consider whether there was plain error in the District Court's

rejection of the claim of qualified privilege.

Affirmed.

DANAHER, Circuit Judge (dissenting).

Appellant was the duly appointed Acting Director of the Office of Rent Stabilization at the time of the alleged libel. "All powers, duties and functions conferred on the President by Title II of the Housing and Rent Act of 1947, exclusive of section 208(a), as amended, [50 U.S.C.A.Appendix, § 1891 et seq., 1898(a)], and delegated to the Economic Stabilization Administrator by Executive Order No. 10276, [50 U.S.C.A.Appendix, § 1898 note], shall be exercised and performed by the Director of Rent Stabilization pursuant to Executive Order No. 10276 and except as otherwise provided by this order." [1]

The declaration of policy of such an executive, as contained in the challenged press release, seems to me to be absolutely privileged. The appellant, exercising by redelegation the President's own powers, was entitled to immunity.[2] The official act was within the scope of those powers. The occasion was such as justified his action. The subject of the release dealt specifically with general matters committed by law to his control or supervision.

Appellee Madigan had been Deputy Housing Expediter in charge of personnel budget and fiscal matters within the agency. Appellee Matteo had been responsible for all technical aspects of the personnel program including recruiting and classification, and had been adviser to the deputy for administration on procedures or policy matters. Mr. Madigan devised a plan, in which both appellees joined, whereby they "terminated themselves one day as permanent employees; received their lump sum accumulated annual leave; were rehired the next day; continued as temporary employees, with the intent to convert back to permanent employees at a later date." Appellant's intra-agency opposition to the plan was known.

Members of Congress publicly attacked the plan. Earlier criticism had been crystallized in the Thomas Amendment.[3] Appellant told appellees on February 5, 1953 "that the plan had become public, the agency was being bombarded with questions from newspapers and other forms of public media, that the agency was being subjected to severe criticism and that in order to protect the good name of the agency and myself I had to take disciplinary action against an act which I deemed improper."

Appellee Madigan two days earlier had prepared a letter to Senator Williams defending the plan. He did not attempt to see appellant about it, but forwarded the letter purporting to bear appellant's signature despite appellant's known opposition to the plan. Both appellees "took advantage" of the plan to use up the ear-marked funds.

Appellant testified that he decided to take disciplinary action "because I felt

---

1. Sec. 4 of GO 9—Organization for Rent Stabilization, 16 Fed.Reg. 7630.

2. DeArnaud v. Ainsworth, 1904, 24 App. D.C. 167, 178, 5 L.R.A.,N.S., 163; Glass v. Ickes, 1940, 73 App.D.C. 3, 117 F.2d 273, 132 A.L.R. 1328, certiorari denied, 1941, 311 U.S. 718, 61 S.Ct. 441, 85 L.Ed. 468; Mellon v. Brewer, 1927, 57 App.D.C. 126, 18 F.2d 168, 53 A.L.R. 1519, certiorari denied, 1927, 275 U.S. 530, 48 S. Ct. 28, 72 L.Ed. 409; cf. Gregoire v. Biddle, 2 Cir., 1949, 177 F.2d 579, cer-tiorari denied, 1950, 339 U.S. 949, 70 S. Ct. 803, 94 L.Ed. 1363.

3. § 1212, General Appropriations Act, 1951, 64 Stat. 768, provided in part: "No part of the funds of, or available for expenditure by any corporation or agency included in this Act * * * shall be available to pay for annual leave accumulated by any civilian officer or employee during the calendar year 1950 and unused at the close of business on June 30, 1951 * * *."

there was no defense for the plan and I had to protect the integrity of the agency and because of my personal position in the matter and the letter had been sent to Senator Williams without my knowledge." [4]

The defense of this case was conducted by the Department of Justice. In the District Court appellant's motion for directed verdict was based in part on the ground that "the press release was qualifiedly privileged." The suit in last analysis, I take it, may be viewed as one against the Government which undoubtedly through Congress will be asked to respond to the judgment. I doubt that Government attorneys possess the power to waive a defense which, if it had been asserted, might have prevailed here. Compare our opinion in Newbury v. Love, 1957, 100 U.S.App.D.C. ——, 242 F. 2d 372, where we found absolute privilege, despite Colpoys v. Gates.[5]

I see no obstacle in the Colpoys case to the result which I believe is required here. The limited functions of a marshal in publishing a statement in connection with the resignation of two deputies are not to be confounded with a situation such as the instant case presents. Even in Colpoys we recognized that officers with policy-determining functions are in a different category, and privilege is shown to have been accorded to acts in the general line of duty.

To recapitulate: here the Acting Director's status and authority stemmed from the President himself. His Executive Order made this agency head, in his own division, a policymaker second only to the Economic Stabilization Director. Involved, as a matter of top interest, was a policy position with reference to a plan admittedly devised to "use up" $2,-600,000 of public funds which had been earmarked for terminal leave. If the appellant thought the Madigan plan had been a perversion of an appropriation to ends beyond the intention of Congress in providing the funds, it was his duty to speak out. He was not alone in his appraisal of the untoward result. His press release did no more than seek to allay the serious challenge to the integrity of the agency and to attempt to restore a public confidence which the use of the plan had impaired. The subject matter was personal to him because his name had without authorization been affixed to an official letter which misrepresented his position. The whole congeries of occurrences, including the position the Acting Director intended to take with reference to the problem, became of vital concern to the public. Under such circumstances, the press release was entitled to the status of privilege.

We need not, indeed I do not seek to, relax the rule which regards a cabinet officer as "absolutely privileged to publish defamation, not only in doing his duty but also in discussing it; his defamation, to be protected, need only have 'more or less connection with the general matters committed by law to his control or supervision.'"[6] I think we should hold only that this officer, on the facts here disclosed, acting in the name of the President and exercising, by redelegation, powers conferred upon him by statute, and possessed of policy-making functions, is immune on account of a policy statement issued within the scope of his authority as to a matter committed by law to his control.

In this view, I think the judgment should be reversed.

4. Cf. Dickins v. International Brotherhood, Etc., 1948, 84 U.S.App.D.C. 51, 171 F. 2d 21.

5. 1941, 73 App.D.C. 193, 118 F.2d 16.

6. Colpoys v. Gates, supra, note 5, 73 App. D.C. at page 194, 118 F.2d at page 17, citing Spalding v. Vilas, 1896, 161 U.S. 483, 498, 16 S.Ct. 631, 40 L.Ed. 780.