# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-04-00656-CV

**Linda Cloud, Appellant**

**v.**

**Mike McKinney and Kathy Walt, Appellees**

### FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
### NO. GN203670, HONORABLE SUZANNE COVINGTON, JUDGE PRESIDING

## O P I N I O N

After a lottery commission employee filed a complaint against the lottery commissioner (Walter Criner), the governor's former chief-of-staff (Mike McKinney) set up a meeting with the executive director for the lottery (Linda Cloud). The subject matter discussed in the meeting is contested by both parties. Cloud insists that McKinney informed her of the specifics of the allegations made against Criner and insists that McKinney instructed her not to discuss the matter with anyone. When she was questioned by a reporter about the allegations against Criner, Cloud told the reporter that she did not know about the allegations against Criner and that she had not discussed the matter with anyone in the governor's office. However, when she later testified before the Sunset Commission, Cloud stated that she had discussed the allegations against Criner with employees of the governor's office. The reporter then questioned McKinney and other employees of the governor's office who all stated that the allegations against Criner were not

discussed during the meeting. In response, Cloud filed a defamation lawsuit against McKinney. In addition, Kathy Walt, a spokesperson for Governor Perry's re-election campaign, stated, in response to a question about the defamation suit, that Cloud had lied repeatedly. Consequently, Cloud also filed a defamation suit against Walt. The district court granted summary judgment in favor of Walt on the ground that there was no evidence that she made the statement with actual malice. The court also granted summary judgment in favor of McKinney on the grounds that he was immune from suit by the doctrines of sovereign immunity and official immunity. We will affirm the judgments of the district court.

## BACKGROUND

A lottery employee accused Criner of making improper sexual comments and contact. After the claim was made, the lottery commission's general counsel informed Cloud about the complaint. Shortly thereafter, McKinney set up a meeting with Cloud to discuss Criner's resignation. The topics discussed during the meeting are disputed by the parties. McKinney contends that, during the meeting, they discussed possible replacements for Criner. Cloud alleges that McKinney also discussed the details of the allegations against Criner and that McKinney told her to keep the discussion secret in a manner that caused her to feel threatened.

Several months after meeting with McKinney, Cloud was called to testify before the Sunset Commission. At the hearing, she testified that she had discussed the allegations against Criner with employees of the governor's office. She also stated that she first became aware that there were allegations against Criner after members of her staff informed her. Finally, contrary to

2

her allegations in this case, she testified that no one had ever instructed her not to discuss the allegations against Criner.

Prior to and after Cloud testified at the hearing, Jay Root, a reporter, questioned Cloud about the allegations against Criner and subsequently published a newspaper article concerning the Criner allegations. In the first article, Root wrote that Cloud declared she had not been informed about the allegations and that she had not discussed them with McKinney. In a subsequent article, Root wrote that Cloud had first indicated that she was unaware of the allegations against Criner. The article also related that Cloud stated she had not discussed the matter with anyone in the governor's office. However, the article related that Cloud told a different story when she testified before the Sunset Commission. The article also detailed that, when Root asked Cloud about the inconsistent stories and about why she had previously stated she had not talked to anyone in the governor's office, she stated that the topic was sensitive and stated that "[i]t put me in a bad position" and "[i]t wasn't something I felt comfortable talking about." In addition, the article commented that, in response to a question regarding whether anyone in the governor's office had pressured her to remain silent, Cloud responded "absolutely not."

After writing these articles, Root questioned McKinney about the allegations against Criner and about his meeting with Cloud at a press conference called for an unrelated matter. In a subsequent article, Root wrote that:

> Cloud's statements [to the Sunset Commission] were in direct conflict with those made by . . . McKinney. Records obtained by the *Star-Telegram* show that McKinney and Cloud met on Feb. 27 and discussed Criner's resignation, but McKinney said Wednesday the allegations never came up.

3

"I wouldn't do that," McKinney said. "Frankly, she's hired help. He was on the board. No matter what, I wouldn't talk to her about that."

After the articles were published, Cloud resigned from her job, stating that she felt her integrity had been impugned due to McKinney's denial of her assertion that they had discussed the allegations against Criner. Around that time, in two articles concerning the Criner allegations and Cloud's resignation, two employees of the governor's office—Gene Acuna and Ray Sullivan—were also credited with stating that the Criner allegations were not discussed in the meeting between Cloud and McKinney. After resigning, Cloud filed a defamation suit against McKinney alleging that McKinney's statements were defamatory because they accused her of lying under oath before the Sunset Commission.

After Cloud filed suit, another newspaper article was written by a different reporter, discussing Cloud's defamation claim against McKinney. The reporter asked Walt, a spokesperson for Governor Perry's re-election campaign, to comment on the defamation suit against McKinney. The article stated that Walt "said the sworn statement is a lie" and quoted Walt as saying Cloud has "'lied repeatedly.'" The article also stated that, when she made these comments, Walt noted Cloud's previous statement to Root that the governor's office had not pressured her to lie regarding the allegations against Criner. After the article was published, Cloud amended her petition to add Walt to the suit.

McKinney and Walt both filed motions for summary judgment. In her motion, Walt contended that Cloud was unable to prove the necessary elements for a defamation claim. Specifically, she argued that Cloud could not prove that the allegedly defamatory statement was made with actual malice or that the statement was false. Further, Walt specified that the finding of

4

actual malice was necessary because Cloud was a public official. In his motion for summary judgment, McKinney asserted that he is immune from suit due to the doctrines of sovereign immunity and official immunity. Further, McKinney contended that Cloud could not prove the necessary elements for maintaining a defamation claim. The district court granted the motions in separate orders. In the first order, the court concluded that there was no evidence of "actual malice" on behalf of Walt and, therefore, summary judgment was appropriate. In the second order, the court concluded that McKinney was protected by the doctrine of sovereign immunity to the extent he was sued in his official capacity or by the doctrine of official immunity to the extent he was sued in an individual capacity. Cloud appeals the judgment of the district court and contends that the trial court erred by granting the motions for summary judgment.

## STANDARD OF REVIEW

When a trial court specifies the grounds upon which summary judgment is granted, summary judgment can only be affirmed if the grounds relied upon are meritorious; otherwise, the case must be remanded. *State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 381-82 (Tex. 1993). A traditional motion for summary judgment must be granted if the evidence shows that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law . . . ." Tex. R. Civ. P. 166a(c); *Little v. Texas Dep't of Crim. Justice*, 148 S.W.3d 374, 381 (Tex. 2004). The movant bears the burden of proving that there is no genuine issue of material fact. *See* Tex. R. Civ. P. 166a(c); *SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005).

In reviewing a motion for summary judgment, an appellate court must take the nonmovant's evidence as true, indulge every reasonable inference in favor of the nonmovant, and

resolve all doubts in favor of the nonmovant. *Little*, 148 S.W.3d at 381. If a defendant conclusively negates at least one element of the plaintiff's cause of action, then he is entitled to summary judgment. *Id.*

A party may move for summary judgment under Rule 166a(i) on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial. Tex. R. Civ. P. 166a(i). Unless the nonmovant produces summary-judgment evidence raising a genuine issue of material fact on the challenged elements, the court must grant the motion. *Id.* The reviewing court must view the evidence in a light that tends to support the finding of the disputed fact and disregard all evidence and inferences to the contrary. *Minyard Food Stores, Inc. v. Goodman*, 80 S.W.3d 573, 577 (Tex. 2002). When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is less than a scintilla and, in legal effect, is no evidence. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). But more than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Id.*

## DISCUSSION

### Cloud's Claims Against McKinney

In her suit, Cloud complains about three sets of statements: McKinney's statements to Root and McKinney's alleged statements to both Acuna and Sullivan, which were subsequently retold to reporters, that indicated that the allegations were not discussed. In light of her testimony before the Sunset Commission, Cloud contends that these statements accused her of lying under oath

6

and, therefore, constituted defamation *per se*. *See Knox v. Taylor*, 992 S.W.2d 40, 50 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (statement is *per se* defamatory if "it injures a person in his office, business, profession, or occupation"). Cloud further asserts that McKinney may not avail himself of the protection of official immunity because, as a party to the allegedly defamatory statements, he was aware that the statements were false and, therefore, cannot satisfy the elements of official immunity because he could not have been acting in good faith when he made the statements. *See University of Houston v. Clark*, 38 S.W.3d 578, 580 (Tex. 2000) (to qualify under official immunity, employee must have been (1) performing discretionary duties (2) that are within the scope of his authority (3) in good faith).

As proof of defamation, Cloud refers to statements in her affidavit and testimony given in various depositions. In her affidavit, Cloud admits that she lied to Root when she told him how she learned of the allegations against Criner: she stated she learned of the allegations by reading about them in the newspaper. However, she also stated that she lied to Root because McKinney had instructed her not to discuss the allegations with anyone. She also insists that, while under oath at the Sunset Commission , she truthfully testified that she had discussed the matter with the governor's office, even though her testimony was "completely at odds" with what she had previously told Root. In her affidavit, Cloud further stated that, although she had been informed that a claim had been made against Criner by a member of her staff prior to the meeting, she did not learn the details of the allegations until her meeting with McKinney.

Cloud also refers to Acuna's and Sullivan's depositions in support of her argument. Both Sullivan and Acuna admit in their depositions that they told reporters that the allegations against Criner were not discussed in the meeting. Cloud argues that Sullivan and Acuna made the

7

statements after being told by McKinney that the allegations were not discussed. As proof of this assertion, Cloud refers to statements in Acuna's deposition in which he stated that, after Root had called him and stated that Cloud had informed him that the allegations against Criner were discussed in her meeting with McKinney, he asked McKinney if that was true. Acuna then stated that McKinney's response was that the allegations had not been discussed.

In addition, Cloud refers to several statements made by McKinney in his deposition. McKinney admitted that during the meeting the "subject of the allegations against Criner did come up." Specifically, he stated that, when Cloud arrived at the meeting, he asked Cloud if she knew about the "Criner business." McKinney also admitted that he told Cloud that Criner "was sure guilty of poor judgment. We'll see about whether he did more than that" and that Criner was "guilty of poor judgment until he grabbed . . . her arm, and then I don't know what he's guilty of."

**McKinney's Immunity Defense**

A plaintiff may sue a governmental employee in his official capacity, in an individual capacity, or in both capacities. *Nueces County v. Ferguson*, 97 S.W.3d 205, 213 (Tex. App.—Corpus Christi 2002, no pet.); *Denson v. Texas Dep't of Criminal Justice-Inst. Div.*, 63 S.W.3d 454, 460 (Tex. App.—Tyler 1999, pet. denied). A suit against a governmental employee in his official capacity is essentially a suit against the governmental agency the person works for, rather than a suit against the individual. *See City of Hempstead v. KMIEC*, 902 S.W.2d 118, 122 (Tex. App.—Houston [1st Dist.] 1995, no writ). On the other hand, a suit against a government employee in his individual capacity seeks to impose personal liability on the individual. *Ferguson*, 97 S.W.3d

8

at 214; *see City of San Angelo Fire Dep't v. Hudson*, 179 S.W.3d 695, 703 (Tex. App.—Austin 2005, no pet.).

The capacity in which the individual is sued affects the defenses to liability that may be raised. *Jackson v. Stinnett*, 881 S.W.2d 498, 500 (Tex. App.—El Paso 1994, no writ). If an individual is sued in his official capacity, the employee may raise any defense that would be available to its employer, including the defense of sovereign immunity. *Texas Parks & Wildlife Dep't v. E.E. Lowrey Realty, Ltd.,* 155 S.W.3d 456, 458 (Tex. App.—Waco 2004, pet. filed); *KMIEC*, 902 S.W.2d at 122. Individuals sued in their individual capacity, however, may not rely on the defense of sovereign immunity but may raise the defense of official immunity. *Ferguson*, 97 S.W.3d at 215; *Gonzalez v. Avalos*, 866 S.W.2d 346, 349 (Tex. App.—El Paso 1993, writ dism'd w.o.j.).

Cloud's petition does not explicitly state whether she was suing McKinney in his official or in his individual capacity. However, on appeal, Cloud asserts that "it is clear that McKinney was sued individually. Nowhere in Cloud's pleadings or discovery does she attempt to sue McKinney in his capacity as a state official."[1] Accordingly, we will limit our discussion to the defense of official immunity.

---

[1] McKinney, on the other hand, asserts that the course of proceedings demonstrates that Cloud was suing McKinney in his official, not his individual, capacity. *See Nueces County v. Ferguson,* 97 S.W.3d 205, 215 (Tex. App.—Corpus Christi 2002, no pet.) (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)) (when petition does not specify what capacity government official sued in, courts look at the "'course of proceedings'" to determine nature of suit). In support of this assertion, McKinney points to an affidavit filed by Cloud stating that she had discussed Criner's allegations with the "Governor's office" and to a statement Cloud made in her deposition admitting that McKinney was acting in his official capacity when he made the statements at issue in this lawsuit.

In his motion for summary judgment, McKinney claims that he is immune from suit by the doctrine of official immunity because he was acting within the scope of his authority when the allegedly defamatory statements were made. Official immunity is an affirmative defense that shields public employees from personal liability in order to encourage governmental employees to vigorously perform their jobs. *Telthorster v. Tennell*, 92 S.W.3d 457, 460-61 (Tex. 2002); *see Clark*, 38 S.W.3d at 580; *City of Lancaster v. Chambers*, 883 S.W.2d 650, 653 (Tex. 1994). The purpose of the defense is to "protect public officers from civil liability for conduct that would otherwise be actionable." *Chambers*, 883 S.W.2d at 653-54. The phrase "official immunity" refers to various immunities that have been granted public servants, including the absolute immunity afforded to judges*, see Baker v. Story*, 621 S.W.2d 639, 644 (Tex. 1981), but always refers to a defense afforded governmental employees sued in their individual capacity, *see City of Mission v. Ramirez*, 865 S.W.2d 579, 582 n.1 (Tex. App.—Corpus Christi 1993, no writ). *See also Travis v. City of Mesquite*, 830 S.W.2d 94, 100-01 n.2 (Tex. 1992) (Cornyn, J., concurring) (referring to various ways official immunity has been referred to, including governmental, quasi-judicial, and qualified).

*Absolute Privilege*

To allow government employees the freedom to fulfill their job requirements without the fear of being sued, various governmental officials have been afforded an absolute privilege against liability for making defamatory statements. *See Martinez v. Hardy*, 864 S.W.2d 767, 772 (Tex. App.—Houston [14th Dist.] 1993, no writ) (absolute privilege may protect government official when sued in individual capacity). Although it is referred to as a privilege, absolute privilege is actually an immunity afforded to certain public servants based on their status within the government.

10

*Hurlbut v. Gulf Atlantic Life Ins. Co.*, 749 S.W.2d 762, 767 (Tex. 1987); *see Attaya v. Shoukfeh*, 962 S.W.2d 237 (Tex. App.—Amarillo 1998, pet. denied); *see also Salazar v. Morales*, 900 S.W.2d 929, 933 (Tex. App.—Austin 1995, no writ) (characterizing absolute privilege in state common-law defamation claims as "official immunity"). When an absolute privilege exists, the actor is protected from a suit for defamation even if the allegedly defamatory statement was false or "published with express malice." *Reagan v. Guardian Life Ins. Co.*, 166 S.W.2d 909, 913 (Tex. 1942); *see Hurlbut*, 749 S.W.2d at 767 (because absolute privilege is an immunity, motivation of actor is irrelevant). For more than a century, judges have enjoyed an absolute privilege against civil suits filed against them in relation to the exercise of their judicial functions. *See Barr v. Matteo*, 360 U.S. 564, 569 (1959) (plurality opinion) (citing *Bradley v. Fisher*, 80 U.S. 335 (1872)). Over time the privilege was extended to other government officials, including officers whose duties are related to the judicial process, heads of executive agencies, and cabinet members. *Id.* at 569-70 (citing *Spalding v. Vilas*, 161 U.S. 483 (1896); *Glass v. Ickes*, 117 F.2d 273 (D.C. Cir. 1940)*; Mellon v. Brewer*, 18 F.2d 168 (D.C. Cir. 1927); *Yaselli v. Goff*, 12 F.2d 396 (2d Cir. 1926), *aff'd*, 275 U.S. 503 (1927)). In *Barr*, the Supreme Court concluded that the privilege should be extended to lower ranking executive officials in certain circumstances. *Id.* at 573.

The need for an absolute privilege for certain executive officials was thoroughly discussed in *Barr*:

> The reasons for the recognition of the privilege have been often stated. It has been thought important that officials of government should be free to exercise their duties unembarrassed by the fear of damage suits in respect of acts done in the course of those duties—suits which would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government.

11

*Id.* at 571;[2] *see also Kassen v. Hatley*, 887 S.W.2d 4, 8 (Tex. 1994) (quoting this section of *Barr* opinion when describing purpose of official immunity).

"Absolute privilege is founded on the theory that the good it accomplishes in protecting the rights of the general public outweighs any wrong or injury which may result to a particular individual." *Town of S. Padre v. Jacobs*, 736 S.W.2d 134, 143 (Tex. App.—Corpus Christi 1987, writ denied) (on reh'g) (citing *Reagan*, 166 S.W.2d at 913). By shielding "government officials against harassment and inevitable hazards or vindictive or ill-founded damage suits" filed in response to actions officials take while fulfilling their official responsibilities, the privilege protects the public interest. *Id.*; *see also Carradine v. State*, 511 N.W.2d 733, 735 (Minn. 1994) (rationale of absolute immunity is that, without it, government officials will timidly perform their functions, which will hurt public). This is true even though the privilege may result in individual citizens suffering some pecuniary loss due to the malicious acts of government officials. *Jacobs*, 736 S.W.2d at 143.

After the opinion in *Barr*, this absolute privilege from liability was adopted in the Restatement (Second) of Torts. Section 591 of the Restatement (Second) of Torts provides, in relevant part, that "an absolute privilege to publish defamatory matter concerning another in

---

[2] In *Barr*, the Supreme Court concluded that the director of the Office of Rent Stabilization had an absolute privilege against liability in a suit for defamation and that the director's issuance of a press release describing that two employees were suspended for misconduct was within the scope of the director's duties. *Barr v. Matteo*, 360 U.S. 564, 575 (1959). Although the opinion did not garner the support of the majority of the Court for the proposition that the director of Office for Rent Stabilization had an absolute privilege against suit, three of the four dissenters did agree that an absolute privilege would apply to cabinet level officials and officials of higher rank. *See id.* at 583 (Warren, C.J., dissenting) (Douglas, J., joining); *id.* at 592 (Stewart, J., dissenting) (agreeing with analysis of plurality but disagreeing that facts in the case support conclusion that director was acting within scope of his duty).

communications made in the performance of his official duties exists for . . . a governor or other superior executive officer of a state."  Restatement (Second) of Torts § 591(b) (1977).  The comments to section 591 explain the rationale behind this absolute privilege: "The public welfare is so far dependent upon a reasonable latitude of discretion in the exercise of functions of high executive offices that their incumbents may not be hindered by the possibility of a civil action for defamation in connection therewith."  *Id.* cmt. a.

In light of section 591 and *Barr*, several Texas courts of appeal have issued opinions concluding that various officials were immune from civil suits for defamation due to an absolute privilege. *See, e.g., City of Cockrell Hill v. Johnson*, 48 S.W.3d 887, 899 (Tex. App.—Fort Worth 2001, pet. denied) (concluding that statements made by three city aldermen concerning removal of plaintiff as police chief were within scope of officials' duties and were absolutely privileged); *Martinez*, 864 S.W.2d at 774 (concluding that, because district clerk employed quasi-judicial powers in personnel evaluation context, communications made by clerk in that context were absolutely privileged); *Jacobs*, 736 S.W.2d at 143-44 (concluding that statements and memo made by city manager regarding employee's termination were made in performance of manager's duties and that manager was protected by absolute privilege in defamation suit).  In *Salazar*, this Court held that the attorney general "has an absolute privilege to publish, in the performance of his official duties, material that may be perceived to be defamatory."  900 S.W.2d at 934.  Salazar was fired from his position as an assistant attorney general for the State.  *Id.* at 930.  A reporter asked the attorney general about Salazar's termination, and the attorney general responded that Salazar was a "disgruntled employee" who had not been doing a good job and that Salazar had filed a suit "without authority from his supervisors."  *Id.* at 930-31.  The attorney general's comments were reported in

13

several newspapers. *Id.* at 931. We concluded that the attorney general has an absolute privilege to "publish defamatory statements in communications made in the performance of his official duties." *Id.* at 932. Further, we concluded that "comments made to the press by a high-ranking official concerning personnel matters are within the scope of the privilege." *Id.* at 932-33; *see also Barr*, 360 U.S. at 574-75 (noting that issuance of press releases is common agency practice and that it was unduly restrictive to conclude that policy-making executive's scope of duty did not include making public statements of agency policy on matters of wide public interest). Therefore, we concluded that the attorney general was immune from suit. *Salazar*, 900 S.W.2d at 934.

In light of the preceding authority, we believe that, as the governor's chief-of-staff, McKinney is a high-ranking policy-making official who has an absolute privilege to publish defamatory statements made in the performance of his official duties. *Compare Barr*, 360 U.S. at 583 (Warren, C.J., dissenting) (stating that absolute immunity might extend to officials appointed by president and directly responsible to him in policy matters) *with Carradine*, 511 N.W.2d at 735-36 (concluding state trooper did not have absolute immunity for statements made to press concerning plaintiff's arrest).

We also believe that the actions complained of by Cloud in this case fall within the chief-of-staff's official duties. As the governor's chief-of-staff, part of McKinney's job is to answer questions regarding matters of public concern.[3] Cloud sued McKinney for statements he made to

---

[3] In his motion for summary judgment, McKinney submitted the affidavit of Donna White, the Director of Administration for the Governor of Texas, which described the duties of the chief-of-staff. Included in this list was the duty to "[r]epresent the agency with all federal, state and private entities and the general public to exchange information, address concerns, coordinate activities and comply with laws and regulations."

14

a reporter at a press conference and for statements he made to two of his aides that were repeated to various reporters and ultimately published. These statements concerned the circumstances surrounding the resignation of a public official: a matter of great public interest. As a high-ranking official, McKinney's statements to the press concerning personnel matters are within his official duties. *See Johnson*, 48 S.W.3d at 898*; Salazar*, 900 S.W.2d at 933. Accordingly, we conclude that McKinney was acting within the scope of his authority when he made the statements at issue in this case.

We have concluded that the governor's chief-of-staff has an absolute privilege to publish defamatory statements made in the performance of his official duties. Moreover, we have determined that McKinney was acting in the scope of his official duties when he made the allegedly defamatory statements and, therefore, he has an absolute privilege against suit. Accordingly, he cannot be held individually liable for the statements. *See Johnson*, 48 S.W.3d at 899. Therefore, even after viewing the evidence in the light most favorable to Cloud, we cannot conclude that the district court erred in granting summary judgment in favor of McKinney on the grounds of official immunity, and we affirm this portion of the district court's judgment.

**Walt's Summary Judgment**

In her second issue, Cloud asserts that the district court also erred in granting Walt's motion for summary judgment on the ground that there was no evidence Walt made the statement with actual malice. Cloud asserts that, by stating that Cloud had "lied repeatedly" and telling a reporter that her sworn statement was a lie, Walt accused Cloud of perjury and defamed her. Cloud

15

argues that, even assuming she was a public official at the time the statement was made, Walt made the statements with actual malice.

In order to succeed in a defamation claim, a plaintiff must prove that the defendant: "(1) published a statement; (2) that was defamatory concerning the plaintiff; (3) while acting with either actual malice, if the plaintiff was a public official or public figure, or negligence, if the plaintiff was a private individual, regarding the truth of the statement." *WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998). In this context, actual malice refers to the defendant's attitude toward the truth of what he said. *See id.* at 573. Actual malice means that the defendant made the statement knowing that it was false or with reckless disregard as to whether the statement was false or not. *HBO v. Harrison*, 983 S.W.2d 31, 36 (Tex. App.—Houston [14th Dist.] 1998, no pet.). To establish recklessness, the plaintiff must prove the defendant "entertained serious doubts as to the truth of his publication." *WFAA-TV*, 978 S.W.2d at 574.

Two prerequisites must be met for the actual malice standard to apply. First, the plaintiff must be a public official for the purposes of the published statements, and, second, the allegedly defamatory statements must relate to the plaintiff's official conduct. *HBO*, 983 S.W.2d at 36. Walt's statements referred to actions Cloud had engaged in as the Lottery Director, and, therefore, satisfied the second requirement. Regarding the first requirement, the determination of whether an individual is a public official is a question of law for the court to decide. *See WFAA-TV*, 978 S.W.2d at 571. Not all government employees qualify as public officials, and there is no specific test for determining whether an individual is a public official. *HBO*, 983 S.W.2d at 36. However, public official status does apply to government employees "'who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs'"

16

and to an employee holding an office of "'such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees.'" *Id.* (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 85-86 (1966)).

The executive director of the lottery commission has "broad authority" and exercises control and supervision over all lottery games in Texas. Tex. Gov't Code Ann. § 466.014(a) (West 2004). As part of her job, the director has enforcement and collection powers and has the authority to (1) hire people to work for the commission, including security officers; (2) enter into contracts for supplies; (3) employ a certified accountant to audit lottery transactions and accounts; (4) investigate violations of the Lottery Act; and (5) maintain a security department and appoint someone to run it. *Id.* §§ 466.014(b), (c); .017(a); .019(a), (b); .020(a), (b) (West 2004). Based on the broad authority given to the position, we conclude that the executive director has substantial responsibility over the conduct of governmental affairs and is, therefore, a public official. *Cf. Foster v. Laredo Newspapers Corp.*, 541 S.W.2d 809, 814 (Tex. 1976) (although county surveyor was in lower echelon of government employees, still considered public official); *Johnson v. Southwestern Newspapers Corp.*, 855 S.W.2d 182, 186-87 (Tex. App.—Amarillo 1993, writ denied) (teacher who was also athletic director considered public official); *Villareal v. Harte-Hanks Communications*, 787 S.W.2d 131, 133-35 (Tex. App.—Corpus Christi 1990, writ denied) (child protective services specialist, whose duties consisted of investigating allegations of child abuse, considered public official).

Cloud asserts that, prior to making the allegedly defamatory statements, Walt did nothing to determine the truthfulness of her statements and, therefore, made the statements with reckless disregard as to their truth. Specifically, Cloud contends Walt did not discuss the

17

defamation suit with the individuals who were present during the meeting. Further, Cloud argues that, because the statements in her affidavit were true, Walt's statement was false and defamatory. As proof of this assertion, Cloud refers back to the evidence described in the previous section as proof that the Criner allegations were discussed in her meeting with McKinney.

However, the fact that Walt did not check with McKinney or Cloud prior to making the statements does not mean that Walt made the statement knowing that it was false or with reckless disregard as to the truth of the statement. In her affidavit, Walt stated that her statements were based in part on Cloud's previous admissions that she had lied. It is undisputed that Cloud lied to Root when she told him how she learned of the allegations against Criner. Further, the article concerning the defamation suit against McKinney stated that, when Walt made the statements, she also noted that Cloud had previously told Root that no one had pressured her to lie about the Criner allegations—a statement Cloud also made to the Sunset Commission. However, these statements are inconsistent with statements in Cloud's petition and in her affidavit that McKinney had instructed her not to discuss the matter.

Further, none of the evidence referenced relates to whether Walt made the allegedly defamatory statements with actual malice or relates to Walt's state of mind when she made the statements. Cloud did not depose Walt and does not contend that she was deprived of the opportunity to obtain evidence regarding Walt's state of mind.

Given that this was a no-evidence summary judgment, that Cloud failed to provide evidence regarding Walt's mental state, that Cloud admitted lying to Root, and that statements in Cloud's affidavit are inconsistent with her testimony before the Sunset Commission, we cannot conclude that the district court erred when it granted the summary judgment motion on the ground

18

that there was no evidence Walt's statements were made with actual malice. Accordingly, we affirm the no-evidence summary judgment granted in favor of Walt.

## CONCLUSION

Because we have concluded that the district court did not err in granting a traditional summary judgment in favor of McKinney or in granting the no-evidence summary judgment in favor of Walt, we affirm the judgments of the district court.

_____

David Puryear, Justice

Filed before Chief Justice Law and Justices Patterson and Puryear;
    Justice Patterson Not Participating

Affirmed

Filed: August 30, 2006